**Honorable Robert S. Lasnik**

IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| YESENIA PACHECO, LUIS LEMUS, and S.L.P., minor child, by and through her Guardian ad Litem, Brian Comfort,<br><br>v.<br><br>UNITED STATES OF AMERICA, | No. 2:15-cv-01175<br><br>PLAINTIFFS' DAMAGES PHASE MOTIONS *IN LIMINE*<br><br>[NOTE ON MOTION CALENDAR: MAY 22, 2020] |

## I.   RELIEF REQUESTED

Plaintiffs request that the Court enter an order granting the following motions *in limine*:

A.   Exclude evidence of domestic violence by any of the plaintiffs;

B.   Exclude evidence of the immigration or citizenship status of the plaintiffs;

C.   Exclude evidence that SLP's future medical special damages might be paid by insurance;

D.   Exclude opinions of Dr. Hunter regarding SLP's future as speculative;

E.   Exclude Dr. Hunter's opinion about the neo-natal causes of SLP's PMG as irrelevant and speculative;

F.   Strike argument that Defendant need not pay for gratuitous care for SLP;

G.   Strike any supplemental opinions of Dr. Hunter, PhD and Jerry J. Tomasevic, MD as untimely;

PLAINTIFFS' MOTIONS
*IN LIMINE* - 1



MAXWELL GRAHAM
535 E SUNSET WAY
ISSAQUAH, WA 98027
206.527.2000
MAXWELLGRAHAM.COM

     H.     Strike witnesses who were disclosed for the first time on April 20, 2020 as untimely. The newly disclosed witnesses are Cindy Marshall, Carly Love, Phillip Smith, Marti McMorick, and Kayela Turner of the Mukilteo School District.

     I.     Exclude evidence or argument in support of a claim that Plaintiffs failed to mitigate.

## II.     AUTHORITY

**A. The Court Should Exclude Evidence of Domestic Violence Perpetuated by Plaintiff Luis Lemus, the Husband of Yesenia Pacheco and Father of SLP, Pursuant To Fed.R.Evid. 403 and 404(b).**

Defendant has deposed both Yesenia Pacheco and Luis Lemus about the nature and extent of allegations of domestic violence. Whether or not domestic violence has occurred is not relevant to the sole issue before the court, which is the nature and extent of the damages. Evidence of domestic violence should be ruled inadmissible per Fed.R.Evid. 402. Even if Defendant can argue some theory for relevance, the Court should exclude such evidence because its probative value is substantially outweighed by a danger of unfair prejudice. Fed.R.Evid. 403.

Even if there were some argument for relevance, such evidence should be stricken pursuant to Fed.R.Evid. 404(b), which provides:

> **(1) *Prohibited Uses*.** Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.

*See Ginter v. Northwestern Mut. Life Ins. Co.*, 576 F.Supp. 627, 629–30 (D. Ky.1984) ("It seems beyond peradventure of doubt that the drafters of F.R.Evi. 404(a) explicitly intended that all character evidence, except where 'character is at issue' was to be excluded" in civil cases).

PLAINTIFFS' MOTIONS
*IN LIMINE* - 2

MAXWELL GRAHAM
535 E SUNSET WAY
ISSAQUAH, WA 98027
206.527.2000
MAXWELLGRAHAM.COM

**B. Evidence of the Citizenship or Immigration Status of Plaintiffs Is Irrelevant.**

SLP was born in the United States and is therefore a citizen by virtue of the 13th Amendment to the United States Constitution. However, in Washington the immigration or citizenship status of her parents, sisters and grandparents is irrelevant and inadmissible. In *Salas v. Hi-Tech Erectors,* 168 Wn.2d 664, 230 P.3d 583 (2010), the Washington Supreme Court considered the issue of whether the undocumented status of a plaintiff was relevant to a claim of future earnings. The Washington Supreme Court held:

> We recognize that immigration is a politically sensitive issue. Issues involving immigration can inspire passionate responses that carry a significant danger of interfering with the fact finder's duty to engage in reasoned deliberation. In light of the low probative value of immigration status with regard to lost future earnings, the risk of unfair prejudice brought about by the admission of a plaintiff's immigration status is too great. Consequently, ***we are convinced that the probative value of a plaintiff's undocumented status, by itself, is substantially outweighed by the danger of unfair prejudice.*** (emphasis added)

*Id.* at 672. This Court should do the same here and hold that any evidence of the immigration status of any of the plaintiffs is inadmissible.

**C. Evidence of Future Collateral Source Payment of SLP's Medical Special Damages Are Inadmissable Pursuant to Washington's Collateral Source Rule.**

Plaintiffs requests that the Court exclude any evidence that SLP's future special damages might be paid by the government or insurance pursuant to Washington's well-established collateral source rule. Defendant's fifth affirmative defense claims that Defendants are not liability for future medical expenses:

> 5. To the extent the plaintiffs are entitled to recover damages from the United States in this action, the United States is entitled to a credit or set-off for any past or future benefits paid to, or on behalf of, or received by the plaintiffs.

Dkt. 44, p. 5.

PLAINTIFFS' MOTIONS
*IN LIMINE* - 3



MAXWELL GRAHAM
535 E SUNSET WAY
ISSAQUAH, WA 98027
206.527.2000
MAXWELLGRAHAM.COM

This affirmative defense is in conflict with Washington's common law collateral source rule. Washington's collateral source rule forbids the admission of insurance to pay for future medical care. Pursuant to WPI 30.07.02, the Plaintiff is entitled to recover the cost of future medical expenses. *Stevens v. Gordon,* 118 Wn.App. 43, 55, 74 P.3d 653, 660, (2003) Under Washington's collateral source rule, plaintiff is allowed to recover damages from a tortfeasor without regard to compensation received for the same injury from an independent source. C*ox v. Spangler,* 141 Wn.2d 431, 439, 5 P.3d 1265, 1269 (2000), opinion corrected, 22 P.3d 791, (2001).

Indeed, Washington courts generally exclude *every* type of collateral source, including, for example: **(1) all forms of government benefits (s**ocial security benefits, veterans benefits, veterans' pensions, welfare benefits, Medicare payments, payments under the Crime Victims Compensation Act, RCW 7.68)[1]; **(2) All forms of public and private insurance benefits: (**Future insurance benefits under the Affordable Care Act ("Obamacare") in a medical negligence case in Washington, TRICARE benefits in in a medical negligence case in Washington, collision insurance, accident insurance, life insurance, health insurance, insurance provided pursuant to a lease agreement, industrial insurance and workers' compensation benefits, personal injury protection (PIP) benefits,)[2]; **(3) all forms of free medical care** (free

---

[1] *See Pancratz v. Turon*, 3 Wn. App. 182, 185, 473 P.2d 409, 411 (1970); *Stone v. City of Seattle*, 64 Wn.2d 166, 172, 391 P.2d 179, 183 (1964); *See Diaz v. State*, 175 Wn.2d 457, 465, 285 P.3d 873, 878, 2012 WL 4125883 (2012) (*citing Mazon v. Krafchick,* 158 Wn.2d 440, 452, 144 P.3d 1168 (2006)); *Ciminski*, 90 Wn.2d at 807 ("[w]e hold that Part A Medicare payment made to respondent is payment from a collateral source and may not be used to reduce the jury's assessment of damages against appellant").

[2] *See* attached Appendix; *Reutenik v. Gibson Packing Co.*, 132 Wash. 108, 121, 231 P. 773, 777, (1924); *Heath v. Seattle Taxicab Co.*, 73 Wash. 177, 186, 131 P. 843, 847 (1913); *Hayes v. Wieber Enterprises, Inc.*, 105 Wn. App. 611, 616, 20 P.3d 496, 499, 2001 WL 315217 (2001) (even when the medical provider accepts less than the amount billed from the health insurer: "[t]he fact that the doctor accepted the first party insurance carrier's limit for his services does not tend to prove his charge for these services was unreasonable")*;Consolidated*

PLAINTIFFS' MOTIONS
*IN LIMINE* - 4

M|G

MAXWELL GRAHAM
535 E SUNSET WAY
ISSAQUAH, WA 98027
206.527.2000
MAXWELLGRAHAM.COM

medical services from a hospital, gratuitous payment or reduction in the outstanding debt by a health care provider)[3]; and **(4) all forms of employment-related benefits** (disability pension benefits, disability benefits that are a "fringe benefit of employment," unemployment compensation, and sick leave.[4]

In contrast with Washington's well-established common law collateral source rule, RCW 7.70.080 provides one strictly-construed legislative exception to the collateral source rule for past economic damages only. However, this statute does not apply for any alleged future benefit or alleged future payment.

Indeed, RCW 7.70.080, a unique statute passed for the benefit of health care providers, modifies the common law by creating a narrow, strictly-construed exception to the collateral source rule in medical negligence cases *for past economic damages only*. It does not apply to alleged future benefits or alleged future payments. The statute, titled "Evidence of compensation from other source," provides as follows:

> Any party may present evidence to the trier of fact that the plaintiff **has already been compensated** for the injury complained of from any source except the assets of the plaintiff, the plaintiff's representative, or the plaintiff's immediate family. In the event such evidence is admitted, the plaintiff may present evidence of an **obligation to repay** such compensation and evidence of any **amount paid** by the plaintiff, or his or her representative or immediate family, to secure the right to the compensation. Compensation as used in this section shall mean payment of money

---

*Freightways v. Moore*, 38 Wn.2d 427, 430, 229 P.2d 882, 884 (1951); RCW 51.4.100; and *Lange v. Raef*, 34 Wn. App. 701, 705, 664 P.2d 1274, 1277 (1983).

[3] *See Carabba v. Anacortes Sch. Dist. No. 103*, 72 Wn.2d 939, 952, 435 P.2d 936, 945 (1967); *See Moceri and Messina, supra,* 7 Gonz.L.Rev. at 312-315; *and* Annot., 77 ALR 3rd 366 (1977); 7 ALR 3rd 416 Section (a) (1966).

[4] *Sutton v. Shufelberger*, 31 Wn. App. 579, 583, 643 P.2d 920, 923 (1982); *Xieng v. Peoples Nat. Bank of Washington*, 120 Wn.2d 512, 525, 844 P.2d 389, 396 (1993); *Hayes v. Trulock*, 51 Wn. App. 795, 804, 755 P.2d 830, 835 (1988) ("we hold that the trial court erred in reducing the back-pay award here by the amount of unemployment compensation received by each employee"); and *Fleming v. Mulligan*, 3 Wn. App. 951, 954, 478 P.2d 754, 756 (1970).

PLAINTIFFS' MOTIONS
*IN LIMINE* - 5



MAXWELL GRAHAM
535 E SUNSET WAY
ISSAQUAH, WA 98027
206.527.2000
MAXWELLGRAHAM.COM

or other property to or on behalf of the plaintiff, rendering of services to the plaintiff free of charge to the plaintiff, or indemnification of **expenses incurred** by or on behalf of the plaintiff. Notwithstanding this section, evidence of compensation by a defendant health care provider may be offered only by that provider. (emphasis added)

RCW 7.70.080 simply modifies the collateral source rule for past medical expenses. The Washington Supreme Court, as recently as 2012, confirmed that "[T]he purpose of RCW 7.70.080 is to delegate to the jury the task of determining whether an injured person ***has already been compensated*** for the injuries and the task of reducing any verdict by the amount of compensation ***already paid*** * * *." *Diaz v. State*, 175 Wn.2d 457, 465, 285 P.3d 873 (2012)(referencing *Adcox v. Children's Orthopedic Hosp. & Med. Ctr.*, 123 Wn.2d 15, 864 P.2d 921, 1993 WL 528412 (1993).

The collateral source rule is a *common law* rule. *Diaz*, 175 Wn.2d at 456. RCW 7.70.080 "supersedes" the collateral source rule with regard to past economic damages. *Id*. Such statutes, "being in derogation of the common law, must be strictly construed and no intent to change that law will be found, unless it appears with clarity." *McNeal v. Allen*, 95 Wn.2d 265, 269, 621 P.2d 1285, 1288 (1980) (citing *In re Tyler's Estate*, 140 Wash. 679, 184, 250 P. 456, 51 A.L.R. 1088 (1926), *Kuehn v. Faulkner*, 136 Wash. 676, 241 P. 290, 45 A.L.R. 571 (1925) and *Gem Trading Co., Inc. v. Cudahy Corp.*, 22 Wn.App. 278, 588 P.2d 1222 (1978), aff'd, 92 Wn.2d 956, 603 P.2d 828 (1979)).

In fact, Washington Courts that have interpreted this statute in unpublished opinions have correctly ruled that RCW 7.70.080's plain language applies to "***past compensation, not future***

PLAINTIFFS' MOTIONS
*IN LIMINE* - 6



MAXWELL GRAHAM
535 E SUNSET WAY
ISSAQUAH, WA 98027
206.527.2000
MAXWELLGRAHAM.COM

*compensation.*" [5]  In *Lafferty v. Stevens Memorial Hospital*, a child was born with a severe brain defect which the plaintiff contended was due to medical negligence. A verdict in the amount of $17,000,000 was entered. On appeal the Washington Court of Appeals discussed future benefits as follows:

> The trial court ruled that evidence regarding benefit [the child] has received through his school was admissible under former RCW 7. 70.080, but excluded evidence of future benefits as not authorized by the statute. The trial court's ruling allowed the Hospital to explore the nature of the services currently provided by the school and the services provided in the past, but excluded evidence about what services would be provided by the school in the future. . . . The Hospital does not challenge the trial court's interpretation of former RCW 7.70.080.

*Lafferty v. Stevens Mem'l Hosp.*, 136 Wn.App. 1027, 2006 WL 3775848, at *13 (2006)(unpublished).

In *Bottemiller ex rel. Bottemiller v. Gentle Dental Serv. Corp.,* 114 Wn.App. 1078, 2002 WL 31895159 (2002)(unpublished), the Plaintiff alleged that medical malpractice caused injury to a six year old child. On appeal, the Court held:

> Under RCW 7.70.080 [the child's] receipt of free therapy benefits since her return to school in 1995 was admissible. But there is no statutory basis to introduce evidence about potential collateral resources that might be available to mitigate damages in the future. Thus, on remand, the trial court should exclude this evidence unless the defense provides alternative authority.

*Id.,* WL 31895159, at *6. The proposition that RCW 7.70.080 only applies to past medical special damages has never even been directly challenged in any published Washington appellate case.

---

[5] See attached Appendix, which includes the following: *Alexander v. United States of America*, U.S. District Court (Western District, Tacoma) cause no. 3:14-cv-01774-RJB (05-02-2016) (Order on Plaintiff's Motion to Strike Evidence of Future Collateral Source Benefits); see also *Carpenter v. United States*, No. 13-5633 RJB, 2014 US Dist. LEXIS 105690 at *15 (W.D. Wash., July 31, 2014) (Order on Defendant's Motion for Partial Summary Judgment dated 07-31-2014); *Merrell v. Group Health, King County,* King County Cause No.: 12-2-02010-8 SEA (Order on Future Collateral Source Benefits dated 07-28-2013*; Lee v. Willis Enterprises*, Grays Harbor County Cause No.: 12-2-00891-1 (Judge Mark McCauley's Order on Plaintiffs' Motions in Limine dated 02-24-2014).

PLAINTIFFS' MOTIONS
*IN LIMINE* - 7

M|G

MAXWELL GRAHAM
535 E SUNSET WAY
ISSAQUAH, WA 98027
206.527.2000
MAXWELLGRAHAM.COM

In 2014, the Washington Court of Appeals indirectly addressed this issue in *Haskins v. Multicare Health Sys.*, 186 Wn.App. 11, 347 P.3d 460 (2014), amended on denial of reconsideration (Mar. 3, 2015), review denied, 183 Wn.2d 1020, 355 P.3d 1152 (2015). *Haskins* is a medical negligence case where plaintiff challenged the constitutionality of RCW 7.70.080, and both parties asserted claims on appeal. The trial court in *Haskins* issued an order *in limine* limiting evidence under RCW 7.70.080 to "past collateral source payments." *Id*. at 13, n.3. The Court of Appeals in *Haskins* described RCW 7.70.080 as "permitting parties to present evidence of past collateral source payments in medical malpractice cases." *Id*. Indeed, Defendant in Haskins defended the constitutionality RCW 7.70.080 by arguing that the statute applied to *past* medical expenses, and never even attempted to argue that RCW 7.70.080 should be interpreted to allow evidence of *future* benefits. *Id*. at 16-20.

In Washington, the availability of future collateral sources is not admissible. Such argument and testimony is contrary to RCW 7.70.080, and Washington common law. This Court should not accept Defendant's attempts to ignore the plain language of RCW 7.70.080 and decades of Washington common law. Any attempt by Defendant to present evidence that SLP's future special damages might be paid by the government or insurance should be prohibited.

**D.  Exclude Tye Hunter, PhD Speculative Opinions Regarding SLP's Future.**

Plaintiffs request that the Court exclude Dr. Hunter's opinions about SLP's future, since his opinions constitute unfounded speculation which is inadmissible. Fed.R.Evid. 702 governs the admission of expert testimony and it states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

PLAINTIFFS' MOTIONS
*IN LIMINE* - 8



MAXWELL GRAHAM
535 E SUNSET WAY
ISSAQUAH, WA 98027
206.527.2000
MAXWELLGRAHAM.COM

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the *1030 evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed.R.Evid. 702. Rule 702 requires that the expert be qualified and that the "'[e]xpert testimony ... be both relevant and reliable.'" *Estate of Barabin v. AstenJohnson, Inc*., 740 F.3d 457, 463 (9th Cir.2014) (quoting *United States v. Vallejo*, 237 F.3d 1008, 1019 (9th Cir.2001)); Fed.R.Evid. 702. Relevancy "simply requires that '[t]he evidence ... logically advance a material aspect of the party's case.'" *Estate of Barabin*, 740 F.3d at 463 (quoting *Cooper v. Brown*, 510 F.3d 870, 942 (9th Cir.2007)).

Reliability requires the court to assess "whether an expert's testimony has a 'reliable basis in the knowledge and experience of the relevant discipline.'" *Id*. (quoting *Kumho Tire Co., Ltd. v. Carmichae*l, 526 U.S. 137, 149, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999)(internal citations omitted)). The Supreme Court has suggested several factors that courts can use in determining reliability: (1) whether a theory or technique can be tested; (2) whether it has been subjected to peer review and publication; (3) the known or potential error rate of the theory or technique; and (4) whether the theory or technique enjoys general acceptance within the relevant scientific community. See *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592–94, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). The reliability inquiry is flexible, however, and trial judges have broad latitude to focus on the considerations relevant to a particular case. *Kumho Tire*, 526 U.S. at 150, 119 S.Ct. 1167.

In determining reliability, the court must rule not on the correctness of the expert's conclusions but on the soundness of the methodology, and the analytical connection between the

PLAINTIFFS' MOTIONS
*IN LIMINE* - 9



MAXWELL GRAHAM
535 E SUNSET WAY
ISSAQUAH, WA 98027
206.527.2000
MAXWELLGRAHAM.COM

data, the methodology, and the expert's conclusions. *Estate of Barabin*, 740 F.3d at 463 (citing *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010)); *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997); See also *Cooper*, 510 F.3d at 942 ("Rule 702 demands that expert testimony relate to scientific, technical or other specialized knowledge, which does not include unsubstantiated speculation and subjective beliefs."); Fed.R.Evid. 702 advisory committee's notes to 2000 amendments ("[T]he testimony must be the product of reliable principles and methods that are reliably applied to the facts of the case."). Moreover, "the proponent of the expert ... has the burden of proving admissibility." *Cooper*, 510 F.3d at 942 (citing *Lust v. Merrell Dow Pharms., Inc.*, 89 F.3d 594, 598 (9th Cir.1996)); see also *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1316 (9th Cir.1995) ( "*Daubert II*" ) ("[T]he party presenting the expert must show that the expert's findings are based on sound science, and this will require some objective, independent validation of the expert's methodology.").

  a. **Dr. Hunter's report in this case includes opinions but fails to set forth any scientific basis for his opinions.**

Tye Hunter, PhD wrote the following in his report of February 5, 2019:

Although Dr. Hill suggested that Sandra is likely to require assistance as an adult, she **may** need less support than she seems at this time. Her ability to profit from remediation as recommended by Dr. Hill, and **developmental growth due to unknown factors such as continued brain plasticity**, and maturing out of language delays due to her home exposure to multiple languages, may elevate her functioning to a somewhat higher level. . . . Because of her young age and the youth of her cohort, more **may** be known about her comparative abilities by the next evaluation that will inform her trajectory toward increased independence or support. . . . In all, it **may** be best to think of her functioning with Global Developmental Delay with her true functioning as an adult not yet known.
…

A final consideration is the diagnosis of bilateral amblyopia, which could be related to her untreated astigmatism and, unlike brain-based unilateral amblyopia, could potentially improve.
…

PLAINTIFFS' MOTIONS
*IN LIMINE* - 10



MAXWELL GRAHAM
535 E SUNSET WAY
ISSAQUAH, WA 98027
206.527.2000
MAXWELLGRAHAM.COM

If her status remains as a typical person with an IQ of 70 and basic adaptive skills, **she may** be able to live a relatively independent life with few supports.

February 5, 2019 Report of Tye Hunter, pp. 12-13; 15.

Finally, Dr. Hunter's report states: "There are some potential complicating factors related to Sandra's neonatal development that could have had some impact on her development." *Id.*, at p. 15. However, Dr. Hunter admitted in his deposition that he was basing his opinions about neo-natal development on conjecture and speculation. *Id*. at pp. 24-26.

Dr. Hunter's opinions are all based on his speculation that "unknown factors" *may* occur to show that she *may* need less support. Thus, his opinions are unreliable because the basis for his opinions is possibilities that might or might not occur in SLP's life. Dr. Hunter provides no explanation as to what those factors are. Indeed, it would be just as easy to have the opinion that "unknown factors" may occur to show that SLP will need *more* support. Thus, Dr. Hunter opinion that SLP will get better as she gets older—based upon "unknown factors"—is nothing more than speculation since he provides no basis for this opinion.

> **b. When Plaintiffs attempted to discovery the scientific basis for Dr. Hunter's opinions at deposition, Dr. Hunter was unable to provide any basis for his opinions.**

Plaintiffs' Counsel took the deposition of Dr. Hunter and asked him whether he held his opinion about SLP's future on a "more probable than not" basis, or whether Dr. Hunter was expressing an opinion about mere possibilities. Although Dr. Hunter insisted that his opinions were probabilities and not possibilities, the following exchange demonstrates that Dr. Hunter was completely unable to express a factual basis for his opinions:

> Q. I'll read that into the record. Quote, "Although Dr. Hill suggested that Sandra is likely to require assistance as an adult, she may need less support than she seems at this time." Are you saying that on a more probable than not basis she will need less support than she seems at this time, or are you saying it's possible that she'll need less support?
> . . .

PLAINTIFFS' MOTIONS
*IN LIMINE* - 11



MAXWELL GRAHAM
535 E SUNSET WAY
ISSAQUAH, WA 98027
206.527.2000
MAXWELLGRAHAM.COM

> A. The probability is based on a number of factors, including whether she receives the remediation and has not yet received some of that remediation. So there are contingencies at play here that make that answer conditional. One of those is that there have been services recommended to the parents at the time I did this interview that they had not yet provided to their child. And so without those services being provided at the time that I examined her, **I think** that had an impact on being able to say -- being able to answer that question with this rubric, so. (emphasis added)

Decl. MM, Ex. B, pp. 12-13.

When challenged, Dr. Hunter resorted to implying that Plaintiffs' expert Deborah Hill, PhD was being "deceptive":

> The 70 IQ score is a global score, but there's some other fluid reasoning abilities that are about the ability to solve problems, for example, that I think will make her function higher. And I think it's a little bit deceptive to just look at that 70 IQ score without breaking that down into the other scores. That's one component of her IQ, that one -- the verbal component drags down the rest of those scores to get to the 70.
> Q. Are you saying that Dr. Hill is being deceptive?
> A. Not at all. **I don't believe that Dr. Hill was doing a forensic examination of this child. I think she was doing a clinical examination**.
> Q. Why do you think that?
> A. The nature of report is clinical.
> Q. So you believe she was doing a clinical rather than a forensic?
> A. Yes.
> Q. How do you think it would have been different if she had done a forensic?
> A. **The forensic evaluations are designed to ask psycholegal questions. I think she was answering clinical questions**. (emphasis added)

*Id.*, p. 14.

Dr. Hill performed a forensic, not a clinical examination. Dr. Hill was retained for the purposes of litigation and is not a treating provider of SLP. Dr. Hunter does not know what he is talking about.

Dr. Hunter's testimony demonstrates that he is only speculating as to SLP's future course:

> Q. All right. Well, what assistance do you believe the evidence shows Sandra will need as an adult?
> A. I don't think we know entirely what assistance she'll need as an adult. My comment was that she **may** need less than was being suggested by Dr. Hill. I don't have precision about that because we don't know yet how much she's going to respond to remediation.

PLAINTIFFS' MOTIONS
*IN LIMINE* - 12



MAXWELL GRAHAM
535 E SUNSET WAY
ISSAQUAH, WA 98027
206.527.2000
MAXWELLGRAHAM.COM

> She **may** respond really well to remediation, she **may** not respond as well to remediation. Those are factors we don't know and we can't know.
> Q. So aren't you really saying that it's an unproven hypothesis how well she'll do?
> A. I'm saying there's a certain amount of unknowability to the hypothesis.
> (emphasis added)

*Id*., p. 15

When confronted with Dr. Hill's opinions, Dr. Hunter testified that he disagreed with them, but was not able to produce a reason for doing so:

> A. On page 10 of Dr. Hill's report, item No. 15 appears to suggest that she will not be able to work and support herself or to live independently, likely will need guardianship and protected/supervised living setting as an adult. It does appear that she's saying that she can't function autonomously.
> Q. It does appear that she's saying that.
> A. Yes.
> Q. On a more probable than not basis, which of those is she wrong about?
> A. **I don't think we know yet**.
> . . .
> Q. You're saying somebody with a 70 IQ in our information age society can live independently as an adult?
> A. **Possibly**.
> . . .
> A. Again, I don't think we know entirely. This child is still very young, she hasn't had the remediation or learning that will determine in fact whether she can live independently, whether she will need guardianship or supervised living as an adult.
> (emphasis added)

*Id*., p. 16-17.

Dr. Hunter clarified that he was not testifying on a "more probable than not basis"; he is merely criticizing Dr. Hill:

> Q. Do you think she will not need assistance as an adult?
> A.      `.
> Q. Are you saying on a more probable than not basis she will, or she will not, or are you saying that you don't know?
> A. I'm saying that I don't agree with Dr. Hill's assessment that -- as it becomes more specific, when she says she may not be able to work in a manner that supports her living needs and may not be able to live independently. **I don't think we know that yet**. (emphasis added)

*Id*., p. 21.

PLAINTIFFS' MOTIONS
*IN LIMINE* - 13

MAXWELL GRAHAM
535 E SUNSET WAY
ISSAQUAH, WA 98027
206.527.2000
MAXWELLGRAHAM.COM

Dr. Hunter bases his opinion by comparing SLP to the wrong group of patients:

> Q. Are you saying that because of unknown factors she will reach a 71?
> A. It's quite -- it's probable.
> Q. Probable?
> A. Yes.
> Q. Why?
> A. Because if you look at her other skills and the fact that she is exposed to both Spanish and English,
> it's known that children who are -- grow up in a bilingual household exposed to two languages at her age have verbal developmental delays that are normal but they show up as lower than they are likely to be later.
> Q. How many studies have you reviewed of children who have bilateral perisylvian polymicrogyria who are raised in bilingual household who have been tracked over time as seeing a rise in their IQs that go from 70 to higher as they age?
> A. None.

*Id.*, p. 22-23.

Dr. Hunter is also speculating as to the cause of SLP's bilateral amblyopia:

> Q. Do you believe that her bilateral amblyopia is not brain based?
> A. I raised that question because the parents had been told that it was brain based, though what they were describing, I just happened to be aware that there could be another explanation and that that required or ought to have further examination.
> Q. You're proposing that that be explored further?
> A. Yes.

*Id.*, p. 27.

At no point during Dr. Hunter's deposition did he ever provide a reliable scientific basis for his opinions. Therefore, the Court should strike Dr. Hunters unfounded opinions.

In *Turpin v. Merrell Dow Pharmaceuticals, Inc.*, 959 F.2d 1349, 1360 (CA6), cert. denied, 506 U.S. 826 (1992), the Court struck the opinion of an expert who similarly based his opinions on his possibilities and speculation. The reasoning of the Court in *Turpin* is applicable to Dr. Hunter's opinions in this case:

> Here, except for Dr. Palmer's testimony discussed below, the plaintiffs' experts stop short of testifying that Bendectin more probably than not caused the birth defects in babies. They stop short because they have no factual or theoretical basis for a stronger hypothesis. They testify that the animal studies show that Bendectin is

PLAINTIFFS' MOTIONS
*IN LIMINE* - 14



MAXWELL GRAHAM
535 E SUNSET WAY
ISSAQUAH, WA 98027
206.527.2000
MAXWELLGRAHAM.COM

"capable of causing," "could cause" or its effects are "consistent with causing" birth defects, not that it probably causes birth defects in general or that it did in this case. In short, they testify to a possibility rather than a probability.

Dr. Palmer, a medical doctor, is the only witness who testified in his affidavit that Bendectin caused Brandy Turpin's defects. He stated:

> It is my opinion . . . that [animal in vivo and in vitro studies, and epidemiological and other human data] shows that Bendectin and specifically its component, doxyalamine succinate, has teratogenic properties . . . . I have also examined the medical records pertaining to Brandy Turpin and it is my opinion . . . . that Bendectin did cause the limb defects from which she suffers.

We cannot find, however, that this testimony is anything more than a personal belief or opinion. The grounds for his opinion are subject to the same criticism as the animal studies and epidemiological reanalyses submitted by the plaintiffs' other experts: the evidence cited in support of his conclusion is insufficient to meet the plaintiffs' burden of proof. Dr. Palmer does not testify on the basis of the collective view of his scientific discipline, nor does he take issue with his peers and explain the grounds for his differences. Indeed, no understandable scientific basis is stated. Personal opinion, not science, is testifying here. Dr. Palmer's own expressed skepticism as to the value of extrapolating human conclusions from animal studies further confounds the issue. Upon analysis, we conclude that Dr. Palmer's conclusions go far beyond the known facts that form the premise for the conclusion stated. This conclusion so overstates its predicate that we hold that it cannot legitimately form the basis for a jury verdict. Beyond that Dr. Palmer's opinion testimony, to the extent that it is personal opinion as described above, is inadmissible. Fed.R.Evid. 703; see also *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 423-24 (5th Cir. 1987) (physician's unsupported personal opinion of causation held inadmissible), and *Calhoun v. Honda Motor Co.,* 738 F.2d 126, 131-32 (6th Cir. 1984) (expert testimony must be based on the evidence, so as to be removed from the realm of guesswork and speculation).

*Id*. at 1360.

Dr. Hunter's testimony in this case constitutes pure speculation and should be excluded by the Court pursuant to Fed.R.Evid. 702.

PLAINTIFFS' MOTIONS
*IN LIMINE* - 15

MAXWELL GRAHAM
535 E SUNSET WAY
ISSAQUAH, WA 98027
206.527.2000
MAXWELLGRAHAM.COM

**E. The Court Should Exclude Any Testimony From Dr. Hunter Regarding the Neonatal Causes of SLP's disabilities as Irrelevant and Based on Speculation or Conjecture.**

Dr. Hunter's February 5, 2019 report states "There are some potential complicating factors related to Sandra's neonatal development that could have had some impact on her development."[6] The neo-natal causes are irrelevant and should be excluded pursuant to Fed.R.Evid. 402. The Court has ruled at trial that there is no contributory negligence case. Further, Dr. Hunter admitted in his deposition that he was basing his opinions about neo-natal causes on conjecture and speculation,[7] which, as set forth above, is inadmissible.

**F. The Court Should Exclude Any Argument That Defendant If SLP Lives with Her Parents When She Becomes An Adult She Has No Economic Losses.**

This argument is contained in pages 5 and 6 of the report of William Partin, Defendant's economic loss expert:

> Scenario 4 assumes S.L.P. will remain in the family home, consistent with Rebecca Bellerive's Option #4. Ms. Bellerive indicated any cost associated with Option 4 are undetermined at this time. Our calculations for Scenario 4 are therefore equivalent to Scenario 1, with no amounts calculated for future living care costs after age 22. Ms. Bellerive indicated in her report, Dr. Tomasovic stated approximately 95% of his patients remain in the family unit until the parents are no longer able or available to provide the necessary care or supervision. It accordingly appears Scenario 4 is the most likely option.

For more than a century it has been the law in the State of Washington that if a tortfeasor creates a need for domestic services, and if the family chooses to provide the domestic services to the injured party free of charge, then the tortfeasor does not get the benefit of the free services. *Howells v. North American Transp. & Trading Co.*, 24 Wash. 689, 694–95, 64 P. 786 (1901) (proper measure of damages is the reasonable value of the services rendered by the family member, not the value of the family member's lost time from own business). See also Connelly, Annotation*, Damages for Personal Injury or Death as Including Value of Care and Nursing Gratuitously Rendered*, 90

---

[6] February 5, 2019 Report of Tye Hunter, p. 15.
[7] Hunter deposition, pp. 24-26.

PLAINTIFFS' MOTIONS
*IN LIMINE* - 16

MAXWELL GRAHAM
535 E SUNSET WAY
ISSAQUAH, WA 98027
206.527.2000
MAXWELLGRAHAM.COM

A.L.R.2d 1323 (1963). Instead, in Washington the tortfeasor is liable for the market value of the domestic services provided by the family. Thus, recovery for the reasonable value of services gratuitously rendered by a member of the family is appropriate. This well-established concept is set forth in WPI 30.09.01, which provides for the recovery of "…the reasonable value of necessary substitute domestic services and nonmedical expenses that will be required with reasonable probability in the future."

### G. The Court Should Strike Any Supplemental Report or Opinions Provided by Dr. Hunter and Dr. Tomasovic As Untimely.

On February 1, 2019, the Court entered Dkt 62, the AMENDED ORDER SETTING TRIAL DATE & RELATED DATES." This order scheduled trial for July 1, 2019. Reports from expert witnesses under Fed.R.Civ.P. 26(a)(2) were due February 6, 2019, which was four months and three weeks before trial. Discovery was to be completed by March 21, 2019, which was three months, two weeks prior to trial.

On October 1, 2019, the Court entered Dkt. 101, ORDER BIFURCATING TRIAL AND CONDITIONALLY COMPELLING RULE 35 EXAMINATIONS. That order stated:

> … the United States' motions to extend the trial and pretrial deadlines and to compel Rule 35 examinations are GRANTED in part and DENIED in part. Trial of the above-captioned matter is hereby bifurcated. The government may immediately request - and the Court expects plaintiffs to provide -signed releases to obtain updated medical and school records related to S.L.P.

Defendant never provided releases to provide Defendant update medical and school records related to S.L.P.  Plaintiffs do not know why Defendant failed to do this.

On March 10, 2020, the Court also entered Dkt. 135, which scheduled trial on July 6, 2020. The order stated: "All other dates have already passed or are specified in the Local Civil Rules."

As of this date, Defendant has not served a supplemental report of Dr. Hunter or Dr. Tomasevic on Plaintiffs. Even if Defendant were to serve a report today, it would be untimely, as

PLAINTIFFS' MOTIONS
*IN LIMINE* - 17



MAXWELL GRAHAM
535 E SUNSET WAY
ISSAQUAH, WA 98027
206.527.2000
MAXWELLGRAHAM.COM

we are now within three months of trial. The Court should exclude any supplemental opinion of Dr. Hunter and Dr. Tomasevic.

### H. The Court Should Strike Testimony from Defendant's Late Disclosed Witnesses as Untimely.

On April 20, 2020, less that three months prior to trial, Defendant served, for the first time, notice that Defendant intends to call the following five witnesses who are employees of the Mukilteo School District to testify at trial: Cindy Marshall, Carly Love, Phillip Smith, Marti McMorick, and Kayela Turner. The Court should strike these five witnesses from testifying at trial as untimely.

### I. The Court Should Prohibit Defendant from Making Any Argument That Plaintiffs Failed to Mitigate.

Defendant may somehow try to place blame on SLP's mother or father for failing to provide access to treatment and services that SLP needs. The Court should refuse to entertain any such argument, whether made explicitly or implicitly.

If Defendant wished to assert the affirmative defense of failure to mitigate, it should have specifically asserted this affirmative defense in its Answer to the Complaint, which it failed to do. While "failure to mitigate" is not listed as one of the enumerated affirmative defenses in Fed.R.Civ.P. 8(c), "failure to mitigate" is a sub-category of contributory negligence, which is listed by Fed.R.Civ.P. 8(c). RCW 4.22.005 provides that contributory fault proportionately diminishes the amount of a claimant's recovery. RCW 4.22.015 defines "fault" as including "unreasonable failure to avoid an injury or to mitigate damages."

Defendant had its opportunity to present a claim of contributory negligence at the liability phase. The Court has already ruled "Ms. Pacheco had no duty or responsibility to do anything other than what she did: there is no contributory or comparative negligence on her part."

PLAINTIFFS' MOTIONS
*IN LIMINE* - 18



MAXWELL GRAHAM
535 E SUNSET WAY
ISSAQUAH, WA 98027
206.527.2000
MAXWELLGRAHAM.COM

Moreover, throughout discovery, Defendant has not provided evidence to support an affirmative defense of failure to mitigate. The party asserting the claim of an unreasonable failure to mitigate damages bears the burden of proof. *Kubista v. Romaine*, 87 Wn.2d 62, 67 n.1, 549 P.2d 491 (1976*); Cox v. Keg Restaurants U.S., Inc*., 86 Wn.App. 239, 244, 935 P.2d 1377 (1997). The Court should strike and disallow any argument regarding failure to mitigate.

## VI.   CONCLUSION

For the foregoing reasons, plaintiff respectfully requests that the Court grant the above described motions *in limine*. A proposed order is attached.

Dated this 8th day of May, 2020.

| MAXWELL GRAHAM, P.S. | ALVAREZ LAW |
|---|---|
| s/ *Michael Maxwell* | s/ *Steve Ralph Alvarez* |
| Michael Maxwell, WSBA#21781 | Steve Ralph Alvarez, WSBA # 23051 |
| 535 East Sunset Way | 705 S. 9th St., Ste. 304 |
| Issaquah, WA 98027 | Tacoma, WA 98405-4600 |
| mike@maxwellgraham.com | Steve@alvarezlaw.com |

PLAINTIFFS' MOTIONS
*IN LIMINE* - 19



MAXWELL GRAHAM
535 E SUNSET WAY
ISSAQUAH, WA 98027
206.527.2000
MAXWELLGRAHAM.COM