1
2
3
4
5
6
7
8
9
10
11
12
13

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

YESENIA PACHECO, LUIS LEMUS,
and S.L.P., minor child, by and through
her Guardian ad Litem, Brian Comfort,,

                                    Plaintiff,

v.

UNITED STATES OF AMERICA,

                                    Defendant,

No. C15-1175RSL

PLAINTIFFS' TRIAL BRIEF FOR
DAMAGES PHASE

14

## I.      Introduction

15

In January 2020, the Court determined in Dkt. 134 that the Defendant's negligence was a

16

proximate cause of the Plaintiffs' Injuries, which include: 1) Yesenia and Luis's Wrongful

17

Pregnancy and Wrongful Birth claim, and 2) SLP's Wrongful Life claim. The purpose of the

18
19

Plaintiffs' Trial Brief is to acquaint the Court with the issues to be decided to render a just verdict.

20

## II.   Plaintiffs' Proposed Verdict

21

Plaintiffs request a verdict as follows:

22

1.      SLP lifetime special damages for reasonable and necessary extraordinary

23

expenses to be incurred during SLP's lifetime as a result of SLP's congenital defect, per

24

*Harbeson*, 92 Wn.2d at 480: $9,330,033 - $9,352,046. This is the amount calculated by

25

economist Bill Brandt who relied upon the life care plan, which was created by Merrill Cohen.

26

Ms. Cohen, in turn, relied upon the medical opinion of Stephen Glass, MD and on the child

PLAINTIFFS' PRETRIAL STATEMENT
FOR DAMAGES PHASE- 1
Case No.: C15-1175RSL



MAXWELL GRAHAM
535 E SUNSET WAY
ISSAQUAH, WA 98027
206.527.2000
MAXWELLGRAHAM.COM

neuropsychologist opinion of Deborah Hill, PhD. Mr. Brandt also relied upon the estimate for future optical care which was created by Ted Kadet, O.D.

2.      SLP past medical special damages: $255,540 for her extraordinary care.

3.      Yesenia Pacheco past medical special damages for the costs of the delivery of SLP: $24,863.65.

4.      Yesenia Pacheco's special damages claim for mental anguish and emotional stress suffered during pregnancy and SLP's life, per *Harbeson,* 98 Wn.2d at 478 in the amount between $4,650,000 and $9,300,000. *Wuth v. Laboratory Corp. of America*, 359 P.3d 841 (2015).

5.      Luis Lemus's special damages claim for mental anguish and emotional stress suffered during pregnancy and SLP's life, per *Harbeson,* 98 Wn.2d at 478 in the amount between $4,650,000 and $9,300,000. *Wuth, Id*.

### III.   The Lemus Pacheco Family

Behind this lawsuit is a united but stressed family. This family includes a mother, a father, two sisters and a disabled girl who reached her eighth birthday in August 2020. Below is a photograph of Luis, Yesenia and SLP as they appeared in July 2015, when this action was filed. SLP's older sisters are not depicted here.

Yesenia and Luis were both born in El Salvador, one of the poorest countries in Central America**.** Yesenia came to the US when she was 16 years old; Luis came to the US when he was 13. Luis is a US citizen. They have worked hard to support themselves and their families in spite of adversity.

Here is a photo of SLP and her parents in the summer of 2015, when suit was filed on their behalf.



1
2
3
4
5
6
7
8
9
10
11
12



13   IV.   <u>The Impact of Perisylvian Polymicrogyria on SLP</u>

14   The reports of the Plaintiffs' experts show that SLP's perisylvian polymicrogyria

15   disabilities include unexpected seizures, mental retardation, limited vocabulary and speech,

16   muscle discoordination, and vision disturbances. However, these are not only the opinions of the

17   Plaintiffs' experts. Here is a summary of the opinions of the **defense** experts:

18
19   a.   <u>Defendant's expert Jerry Tomasevic, MD</u>

20   MRI of SLP's brain at Swedish Medical Center revealed a left perisylvian

21   polymicrogyria. Seizures returned within two months of life prompting additional

22   neurodiagnostic imaging and neurophysiologic studies. The child initially demonstrated mild

23   right-sided motor weakness, which was expected to have been associated with the

24   polymicrogyria abnormality. Over the next few years, multiple hospitalizations and medication

25   adjustments were required to generate satisfactory seizure control.

26

PLAINTIFFS' PRETRIAL STATEMENT
FOR DAMAGES PHASE- 3
Case No.: C15-1175RSL



MAXWELL GRAHAM
535 E SUNSET WAY
ISSAQUAH, WA 98027
206.527.2000
MAXWELLGRAHAM.COM

As of October 2018, SLP was receiving 420 mg of Oxcarbazepine twice daily and 700 mg of Levetiracetam twice daily, Midazolam for breakthrough seizures had not been utilized for several years, weekly MiraLAX was administered for constipation. Supervision was necessary for monitoring daily activities which included dressing and toiletry but not feeding or nutrition. SLP was functioning below average for her chronological age.

SLP is identified on the WISC-V a full scale I.Q. of 70 with a mixture of performances above and below that value. Weaknesses in the language arts area were evident. Memory skills were somewhat higher as were visuomotor and her adaptive functioning did place her with the Vineland in the 8th percentile. School records confirmed broad academic difficulties in reading, math and writing but strengths in her disposition.

SLP has cognitive impairment with a continued need for educational process and is at risk for future seizures with a need for future supervision.

As of 2019, SLP continues to receive anti-epileptic medication and is followed at Seattle Children's Hospital. S.L.P. has remained at risk for seizure activity in the future. School records from Horizon Elementary identify educational difficulties, which are being addressed with academic performances in 2018 in the low average range between the 10th and 19th percentile. In the most recent educational plan team meeting on December 12, 2019, S.L.P. continues to qualify for special education in her academic subjects, speech and occupational therapy. SLP's congenital brain malformation, places S.L.P. in the low intellectual range with academic challenges.

      b.   <u>Defendant's Expert Tye Hunter, PhD, Report of October, 2018:</u>

SLP has articulation issues and makes phonological errors and has motor problems in forming words (dysarthria) due to brain dysfunction. She has reduced vocabulary, uses short

PLAINTIFFS' PRETRIAL STATEMENT
FOR DAMAGES PHASE- 4
Case No.: C15-1175RSL



MAXWELL GRAHAM
535 E SUNSET WAY
ISSAQUAH, WA 98027
206.527.2000
MAXWELLGRAHAM.COM

sentences, and she frequently relies on repetition as might be more typical of a younger child. problems with eating and motor skills, and problems separating when dropped off at school. SLP has a history of fevers, frequent colds, and she has taken anticonvulsant (seizure) medication since birth. She has shortness of breath at physical exertion, constipation, and a clumsy walk. She has frequent rashes, a history of seizures, and speech defects. She has vision problems and she wears glasses. She has a short attention span and high need for parental attention. She gets angry when her parents don't pay attention to her.

SLP has seizures because her brain is deformed and she takes medication twice daily. She has problems with motor skills and balance and tires easily. Problems are noticed on the right side including problems with learning and problems with eyesight, and bathing, changing, and eating. In dressing she sometimes takes off clothes incorrectly and sometimes her pants are inside out because she can't see well. In eating she sometimes grabs food and other times just stares at it. She has problems with speech, reading, writing, eating, dressing, bathing, and toileting.

There are currently no services in place for medical or school needs. At school they are planning treatment for writing, reading and speech. She needs help with speech writing and reading.

She has headaches and can't go for long walks because she tires easily.

SLP is noted to have a medical condition (seizures), a developmental disorder, and an intellectual disability and/or learning disabilities. SLP has social skills deficits, social withdrawal, immaturity, and attention deficit as well as sleep disturbance.  SLP's somatic complaints include headaches, problems with her right hand, making noises and talking in her sleep, complaining that her arm is numb, and some times she can't walk and she limps.

PLAINTIFFS' PRETRIAL STATEMENT
FOR DAMAGES PHASE- 5
Case No.: C15-1175RSL



MAXWELL GRAHAM
535 E SUNSET WAY
ISSAQUAH, WA 98027
206.527.2000
MAXWELLGRAHAM.COM

Moca B results indicate that she was not able to complete the executive function task or many other tasks and misidentified a tiger as a lion. On the Mini-Mental State Exam for Children SLP scored 21 with a cut score of 24 indicating developmental delays in tasks.

SLP was delivered by emergency C-section following prolonged fetal bradycardia, which required PPV resuscitation. She later received occupational therapy for early motor issues and recognition of family names. More recently, her 2016 problem list indicates seizures, polymicrogyria, status epilepticus, and pyelonephritis. Developmental assessments were conducted at Northwest Center Kids in 2014 and SLP qualified for early intervention for speech and language. She was found to have a mild expressive speech/language delay.

On 5/18/2018 there was a referral for an eye doctor due to myopia of both eyes. Problem list includes Keratosis pilaris, Epilepsy, Seizures, Polymicrogyria, Seizure Disorder, Status Epilepticus, and Pyelonephritis. Seizures were listed as Chronic. Active medications include oxcarbazepine, acetaminophen, Aquaphor topical ointment, Miralax, Keppra, and Midazolam HCL. Seizure Care plan was included.

SLP developed an early and significant seizure disorder co-occurring with a brain malformation, bilateral perisylvian microgyria (PMG). Brain scans revealed left perisylvian polymicrogyria involving left frontal and left perisylvian areas. She had intrapartum asphyxia (IA; low oxygen supply). She has shown developmental delays since infancy and right-sided weakness in her hand, leg, and trunk, and developed left hand dominance due to right side hemiparesis. SLP has farsightedness and astigmatism for which she wears corrective lenses. She was given a diagnosis of bilateral amblyopia.

Review of school records indicates that SLP was having difficulty retaining information, and began reading and math support. She was noted to have speech intelligibility at 25% and



MAXWELL GRAHAM
535 E SUNSET WAY
ISSAQUAH, WA 98027
206.527.2000
MAXWELLGRAHAM.COM

language delays were noted. SLP had an awkward pencil grip and was unable to write her name or any recognizable figures and only a few letters of the alphabet.

SLP scored in the Very Low (Borderline) range with a Full Scale IQ (FSIQ) score of 70 (70 is the traditional cut score for Intellectually Disabled). Scores on the Index scales that comprise the FSIQ were varied. The Verbal Comprehension Index (VCI) was in the Extremely Low to Very Low-Borderline range of 60-75. The Visual Spatial Index (VSI) was 89 and in the Low Average range. The Fluid Reasoning Index (FRI) was in the Very Low (Borderline) range at 76. The Processing Speed Index (PSI) was in the Low Average Range at 83. The Working Memory Index was 72, in the Very Low (Borderline) range. SLP is Intellectually Disabled. She will have significant difficulty keeping up with peers and will need special education to help her progress and may have difficulty reaching independence as an adult. On the Braken Scales for receptive and expressive language SLP, at age six, is in the Very Delayed Range with an estimate of performance equivalent to a child the age of 4 years.

The CTOPP2 test measures sound processing skill related to language skill for literacy and found SLP at well below average in Phonological Awareness, Phonological Memory, and Rapid Naming. Results indicated a severe delay in language skills required for early literacy. Beery VM16 test of developmental visual motor skills found SLP in the Low Average Range with a standard score of 88 and estimated an ability to correctly draw items at an age level of 4 years 11 months. Separately administered visual perception and motor coordination tasks were reported as lower. Her vision, pencil grip, and fine motor coordination were noted as concerns.

In the CELF-5 to assess language development and literacy, SLP's Core Language score of 64 indicated significant delay in the very low to severe range compared to age mates. Her receptive language score was 71 and expressive language was 64 and in the very low range with



MAXWELL GRAHAM
535 E SUNSET WAY
ISSAQUAH, WA 98027
206.527.2000
MAXWELLGRAHAM.COM

expressive language more impacted. Language content and language structure were in the very low range. Age equivalent scores place her language skills in the 3 to 4 year old range when chronologically at the age of six.

Memory skills were assessed with the CHAMP test battery and her score on the Total Memory Index was in the Below Average Range at 82. She has a weak ability to hold new items or a series of pictures of abstract objects or places in mind while working to understand or recall and struggles to remember verbal and pictorial information.

Assessment of adaptive functioning was conducted using the Vineland Adaptive Behavior Scales (Vineland-3). SLP placed on the Adaptive Behavior Composite at 79, at the 8th percentile. Her age equivalent scores ranged from 3 years 8 months in self care-hygiene, to 3 years 5 months in play-leisure, to 4 years 2 months in interpersonal relationships, to 2 years 8 months in gross motor skills, to 5 years in fine motor skills, to six years in coping skills and domestic daily living skills.

Teachers completed a Behavior Assessment System for Children (BASC-3) and Behavior Rating of Executive Functioning (BRIEF-2) for SLP. Her teacher indicated difficulties with learning on the BASC-3 and on task monitoring on the BRIEF-2.

Diagnosis was provided as follows:

Language Disorder (DSM-V 315.39; ICD10 F80.9)

Intellectual Developmental Disorder (DSM-V 317; ICD10 F70) due to brain malformation, with right hemiparesis, speech and vision concerns, epilepsy, and history of hypoxic ischemic encephalopathy.

SLP has difficulties with intellectual deficiency and basic academic skills are delayed. Motor concerns are present with both gross motor skills for tone and balance and fine motor

M|G

MAXWELL GRAHAM
535 E SUNSET WAY
ISSAQUAH, WA 98027
206.527.2000
MAXWELLGRAHAM.COM

skills for handwriting and related tasks and fine motor daily living skills, and motor skills needed for speech intelligibility. Vision concerns are present. SLP will need special education services until age 21, and supported living circumstances as an adult.

      c.    <u>Defendant's Expert Tye Hunter, PhD, Report of February, 2020:</u>

S.L.P. obtained a PPVT-5[1] standard score of 74. Using the confidence interval of 90%, S.L.P.'s true score falls in the range of 71 to 79. The percentile rank of 4 means that S.L.P. scored as well as or better than 4 percent of examinees of the same age. The test-age equivalent is 4 years, 10 months (4:10).

S.L.P. obtained an EVT-3[2] standard score of 76. Using the confidence interval of 90%, S.L.P's true score falls in the range of 73 to 81. The percentile rank of 5 means that she scored as well as or better than 5 percent of examinees of the same age. The test-age equivalent is 4 years, 5 months (4:5).

S.L.P. was administered several subtests of the WTAT-III. Her Listening Comprehension score (SS=84, Age Equivalent 5:10) was in the mildly impaired to low average range, consistent with other results. Her Early Reading Skills score was in the severely impaired range (SS=50, Age Equivalent 4:8). Math Problem Solving (SS=74, Age equivalent 6.0) is in the mildly impaired range and Numerical Operations (SS=76, Age Equivalent 6:0) is the mildly impaired range. Alphabet writing fluency is in the average range (SS=97, 7:4). Word reading (Age Equivalent <6:0) and Spelling (Grade Equivalent 5:0) are moderately impaired (SS=63, ). She

---

[1] The PPVT-5 measures receptive vocabulary knowledge of various parts of speech such as nouns and verbs.
[2] The EVT measures expressive vocabulary knowledge with two types of items: labeling and synonyms.

PLAINTIFFS' PRETRIAL STATEMENT
FOR DAMAGES PHASE- 9
Case No.: C15-1175RSL



MAXWELL GRAHAM
535 E SUNSET WAY
ISSAQUAH, WA 98027
206.527.2000
MAXWELLGRAHAM.COM

has a mix of relative strengths with better skills in receptive language and numerical skills and poorer skills in reading and written expression skills.

Her overall level of adaptive functioning described by her score on the Adaptive Behavior Composite (ABC) is 70, which is well below the normative mean of 100 (the normative standard deviation is 15). The Adaptive Behavior Composite (ABC) score is based on scores for three specific adaptive behavior domains: Communication, Daily Living Skills, and Socialization. The domain scores are also expressed as standard scores with a mean of 100 and standard deviation of 15. The Communication domain measures how well she listens and understands, expresses herself through speech, and reads and writes. Her Communication standard score is 63. This corresponds to a percentile rank of 1. This domain is a relative weakness and represents a moderate impairment. The Daily Living Skills domain assesses her performance of the practical, everyday tasks of living that are appropriate for her age. Her standard score for Daily Living Skills is 68, which corresponds to a percentile rank of 2. This domain is a relative weakness for S.L.P. and represents a moderate impairment. Her score for the Socialization domain reflects her functioning in social situations. Her Socialization standard score is 82. The percentile rank is 12. This domain is a relative strength and represents a mild impairment. Her standard score on the motor skills domain is 73.  The percentile rank is 4 and represents a mild impairment.

S.L.P. is in the overall moderately impaired level of adaptive functioning with a moderate impairment in communication and daily living skills, and mild impairment in socialization and motor skills.

      d.     <u>Defense Expert Lee Klombers, MD, LLC:</u>

PLAINTIFFS' PRETRIAL STATEMENT
FOR DAMAGES PHASE- 10
Case No.: C15-1175RSL

M|G

MAXWELL GRAHAM
535 E SUNSET WAY
ISSAQUAH, WA 98027
206.527.2000
MAXWELLGRAHAM.COM

SLP developed seizures early life with APGARS recorded as 2 at 1 minute at 7 at 5 minutes.

An MRI performed on day 4 of life demonstrated left perisylvian polymicrogyria involving the left frontal and left perisylvian areas.   Subsequent neuroimaging performed on 12/5/14 was consistent with bilateral perisylvian polymicrogyria, left side worse than right side.

SLP required extensive seizure management during the first several years of life that necessitated many hospitalizations and medication adjustments. She was noted lo have developmental delays from infancy onward including motor and language delays. The family noted right-sided weakness involving her right hand, leg and trunk.

According to optometric records of Ken Mayemura, O.D. dated 7/22/18 a history was recorded that stated "Patient failed school eye exam. Near vision decreased must get close to TV. Distance vision decrease patient walks into objects. Patient broke her glasses a year ago. Didn't bring in glasses today."

On that initial visit unaided acuities were 20/50 in each eye. A distance ocular alignment was measured as "ortho," (in other words, aligned). A moderately high degree of hyperopic astigmatism was identified. The claimant was diagnosed with refractive amblyopia in both eyes. On a return: visit on 8/31/18 a history was recorded that "per mom when watching TV patient wants to try and take glasses off to see better, still having blurry visual acuity with or without glasses." At that visit an aided distance acuity (corrected acuity) was recorded as 20/25 in each eye. Full time glasses wear was recommended.

Dr. Epley performed a full pediatric ophthalmic evaluation including a dilated exam and cycloplegic refraction. He noted her visual acuity with her existing glasses was 20/40 OD ad 20/25 OS with single letters. Her current glasses at that time were +4.00 – 1.50 x 2 degrees with

---

PLAINTIFFS' PRETRIAL STATEMENT
FOR DAMAGES PHASE- 11
Case No.: C15-1175RSL



MAXWELL GRAHAM
535 E SUNSET WAY
ISSAQUAH, WA 98027
206.527.2000
MAXWELLGRAHAM.COM

an add of +1".25 and OS +3.25 - 0.75 x 177 with an add of 150. The cycloplegic refraction revealed a significantly increased degree of hyperopia demonstrating 0D +5.75 -1".75 x L70 and OS +4.75 - 1.00 x 180. With that refraction she improved to 20/30 in each eye. Without correction at near she had 15 of intermittent esotropia.

The following diagnoses were opined:

1. Learning disabilities

7. Accommodative esotropia

3. Anisometropia

4. Hypermetropia of both eyes

5. Astigmatism of both eyes

Dr. Epley opined, "accommodative esotropia is crossing of the eyes that is induced by hyperopia. The accommodative convergence reflex is not working appropriately and the eyes cross in response to the accommodation necessary to see clearly through the hyperopia. This is one of the few types of strabismus that can be corrected without surgery and its correction involves wearing spectacles full time.

V.     The Emotional Distress and Mental Anguish Experienced by Luis and Yesenia.

Yesenia came to the United States when she was 16. She was pregnant with her first child, ELP.  Upon her arrival in the United States, Yesenia lived with her mother and brother. Yesenia went to work out of economic necessity shortly after ELP was born. Yesenia met Luis through her brother and he began coming to her work. They became a couple when Yesenia was 21.

When Yesenia became pregnant with JLP, her second daughter, she was working two jobs by choice. After JLP was born she cut down to one job. Luis worked a variety of jobs. They



were living together in a committed relationship. During the pregnancy with JLP, life became difficult due to the stress of pregnancy with a young child at home.  After JLP was born Yesenia became firm in her decision that their family was complete with two girls. Yesenia took responsibility for her own reproductive rights and decided against having more children. Luis had wistful thoughts about having a son but agreed with Yesenia that their family was complete with two girls.

When JLP was two years old, Yesenia and Luis described their life as "good". They went out together, went to family BBQ's, watched Luis play soccer. They took the girls to the park, the beach and to play at McDonalds. They arranged their work schedules so that they could cover childcare themselves. Luis worked in the evening so that Yesenia could work in the afternoon. They felt they had time to pay attention to both girls, have meals together, and have a good family life. They had just secured their first apartment and were looking forward to making a home. They were saving money for a second car to make scheduling with the girls and work easier. Yesenia had plans to work and go to school to learn English. She loved work and wanted to work her way up the chain in a fast food business. She was commended for her work and thrived as a working mother.

To protect herself from having to undergo an unintentional pregnancy, Yesenia switched to using Depo-Provera, a reliable form of birth control. The reason for her taking the Depo-Provera was because of  child rearing financial concerns. In addition, they felt the family was complete with two children.

During 2011, Yesenia and Luis felt that their life was going well. JLP was two years old and Yesenia was looking forward to working more, moving toward her goals of increased economic security, improving her English, and moving up in her chosen career.

PLAINTIFFS' PRETRIAL STATEMENT
FOR DAMAGES PHASE- 13
Case No.: C15-1175RSL



MAXWELL GRAHAM
535 E SUNSET WAY
ISSAQUAH, WA 98027
206.527.2000
MAXWELLGRAHAM.COM

On December of 2011, Yesenia found out from her health care providers that she was two and a half months pregnant. She was shocked and worried about her future.

Yesenia called Luis immediately upon learning of the pregnancy. Luis turned pale and worried about the future when he was told about the pregnancy. Luis suspected Yesenia might be pregnant, but he thought that she could not get pregnant because she was receiving Depo Provera.

Yesenia describes her pregnancy as "tough". She had diabetes and had to prick her finger three times a day. She managed the diabetes through diet because she wanted to avoid insulin for the health of the baby. SLP was born via emergency C-Section. Yesenia lost a lot of blood and Luis was frightened both Yesenia and the baby would die. The doctor came to see Luis and told him: "you have a beautiful girl". But the joy and relief came to a halt abruptly.

The immediate aftermath of SLP's birth was a nightmare for Yesenia and Luis. They were told shortly after she was born that SLP "wasn't well".  SLP was immediately taken to the Neonatal Intensive Care Unit. SLP had her first seizure within minutes of her birth.

Yesenia had a lot of questions as any parent would. SLP was in the NICU for three and a half weeks. Yesenia had to pump her breasts to provide milk for SLP and she was tube fed. Before SLP left the NICU the doctors had a conference with Yesenia and Luis. They had a lot of questions as any parents would. Yesenia's recollection of what they were told is that SLP will not be able to eat properly or walk properly, that she would be on lifetime medications due to her seizures, and that her development would not be normal.

SLP was later diagnosed with Bilateral Perisylvian Polymicrogyria.

After SLP left the NICU the family was hoping for the beginning of some kind of normal life. However that did not happen. The first two years were the tough on Yesenia and Luis. SLP

had numerous seizures causing them to have to go, by ambulance to the hospital. Sometimes she would have to stay at the hospital for numerous days. Yesenia would stay with SLP during those overnight hospital stays. This caused tremendous stress and worry for Yesenia and Luis. It was unpredictable when the seizures would occur and how it would affect SLP. Around five years of age, the seizures started to diminish. Nonetheless, they still live in the fear of SLP having future seizures.

Taking care of SLP came at the expense of taking care of the other two daughters.

On top of the constant fear of the convulsions from seizures, there were many therapy and specialist appointments several times a week. First they worked with SLP's hips through physical therapy. Later she received speech therapy. Yesenia and Luis had to rearrange their life to accommodate SLP's extraordinary care. Both felt stressed and worried about their future.

The stress of raising a child with mental disabilities impacted Yesenia and Luis.

With a medically fragile child who will need a lifetime of care and also with two other young, lively children to care for, Yesenia was forced by circumstances to stop working. SLP's needs became her first priority. For the first five years of her life, Yesenia and Luis worried constantly about SLP's well being. This stress took, and continues to take, an emotional toll on them. Now that SLP is in school full time, daily life is less stressful for Yesenia and Luis, especially now that SLP is eight years old. Both parents have more time for their other children and Yesenia no longer has to take SLP to all of her therapies; they are provided by her school, with the exception of her vision therapy. SLP's motor skills have improved and she is steadier walking and her speech has improved. SLP is learning letters and sounds and beginning to blend them into words. Testing conducted by Dr. Hill places her cognitive ability in the range of intellectual disability. Additionally she has language, academic and motor delays.



MAXWELL GRAHAM
535 E SUNSET WAY
ISSAQUAH, WA 98027
206.527.2000
MAXWELLGRAHAM.COM

When it was time for SLP to attend school, Yesenia struggled to let her go. Yesenia describes how she wanted to go to school with SLP because she was so afraid SLP would have a seizure and the school would be ill equipped to manage it. The school developed a health care plan with the family and Yesenia is more confident about her safety at school. However, Yesenia knows that should SLP have a seizure, she will need to be available round the clock. She can no longer work because of the unpredictable demands of SLP's health needs. Yesenia also monitors SLP daily to see if she is tired, has a cold, or seems stressed. Any of those conditions places SLP at higher risk for a seizure. On such days Yesenia keeps SLP home from school.

Although SLP is making developmental progress, she still requires constant monitoring at home. Aside from watching SLP constantly for signs of seizures, if left unattended for even a short time SLP is given to impulsive behavior such as cutting up her clothes or drawing with markers on the walls. And although SLP is described as sweet, she has explosive tantrums that are difficult to deal with if she doesn't get something she wants. In addition to normal parental stress to calm a child who is upset, Yesenia and Luis fear that if SLP becomes upset she will have a seizure.

In addition to the constant fear of seizures and need for constant supervision, Yesenia and Luis struggle to manage their fears about SLP's future. They are fearful of her future as an adult. But they are committed to taking care of her for the rest of her life.

Yesenia and Luis have fears over what will happen to SLP when they die or are no longer able to take care of her. They are both terrified about SLP being institutionalized. This constant tension and fear about SLP has taken a toll on Yesenia and Luis's marriage and on their family.



At a certain point, because Yesenia could not work, the electricity at their apartment was cut off and they struggled to have enough food for the family. Luis tried to work as much overtime as possible, but the loss of Yesenia's income negatively was too much to overcome.

Having a child who has seizures is a stress on a marriage and having a child with developmental delays is a stress on a marriage. Yesenia and Luis have to cope with both. Both Yesenia and Luis feel fear, guilt, anger and sadness. They are overwhelmed and fearful of the future.

In research conducted on effects of having a child with epilepsy, a study published in the Journal of Child Neurology conducted by Hua-Huei Chiou and Liang-Po Hseih MD using a parenting stress index found the following:

*"Parents with an epileptic child have a higher level of stress on the depression scales. In physician's reports on parental reactions they indicated parents undergo a deeply vulnerable and unsettling period after an epilepsy diagnosis. Parents often reacted with fear, guilt, anger and sadness. They described the parents as being overwhelmed and viewing the epilepsy as a disaster."*

Numerous studies have reported that parents of children with disabilities reported a higher level of parental stress than parents of children without disabilities. Anyone who has been a parent knows that there is plenty of stress in raising children but most parents do not fear for their child's safety every hour of the day and they feel confident their child will grow up and be able to function as an independent adult and take care of themselves. Yesenia and Luis are burdened with the constant fear of SLP having seizures as well as the realization that she will not be able to care for herself as an adult. They are in a constant and chronic state of heightened anxiety and hypervigilance.



MAXWELL GRAHAM
535 E SUNSET WAY
ISSAQUAH, WA 98027
206.527.2000
MAXWELLGRAHAM.COM

Yesenia and Luis's entire marital and family focus is on taking care of SLP. They are not able to go out and enjoy themselves as a couple. They go everywhere as a family so SLP is never left unattended or cared for by nonfamily members. They have neither time nor resources to support their children's interests or activities, including SLP's. SLP sleeps next to her parents every night so they can listen for seizures. As a result, they lack marital privacy and they lack time for focusing on their emotional life as a couple. This impacts their physical and emotional intimacy.

On a personal level Yesenia had to cancel any ambitions she had for herself. She cannot go back to school to learn English. She cannot work let alone work up the corporate ladder in a fast food chain, which was her dream. She is forced to stay home to take care of SLP all the time. She uses the time when SLP is at school to clean her house, cook, do laundry and maintain her household so that when SLP comes home she has Yesenia's undivided attention. Her older girls help with SLP a lot, but ELP is now in high school and soon will be developing her own adult life as will JLP.

Luis lives under the constant stress of having to provide for a family of five on one income. He works as many hours as he can to make ends meet because Yesenia is not longer able to work.  Luis does not have the time he would like to engage in recreational activities, support his older daughters, spend time with his wife, and relax. He loves Yesenia, but feels the absence of her attention since it is constantly taken up by SLP.

As Luis put it with the pregnancy and birth of SLP "*all their plans came crumbling down*" and they are forced to live with the aftermath of a pregnancy they responsibly tried to prevent. Instead of being able to both work, realize their financial, educational and career goals, spend quality time with their two older girls, have a normal and joyful marital relationship, and enjoy



leisure time, they now live in fear they will have to provide for and parent for the rest of their lives a child with a seizure condition and a significant developmental disability. Yesenia and Luis have the most challenging and difficult jobs without the benefit of seeing their children successfully reach adulthood. SLP will never be a typical child nor will she ever be independent. In spite of their love and care for SLP, this is a cruel and painful acknowledgement for Luis and Yesenia.

Yesenia and Luis got married on June 25, 2017. Despite the added struggles of raising a child with mental disabilities, the care and concern they have for each other, their marriage and their children are visible. They have a long and difficult road ahead of them and they will require significant support.

## VI. <u>Yesenia's Medical Records</u>

Ms. Pacheco's pregnancy records reveal the following. The pregnancy was the result of a failure by Neighborhood Health Clinic to administer Ms. Pacheco's contraceptive shot. The pregnancy that resulted from this failure was unexpected, shocking, and undesired to both Mr. Pacheco and Mr. Lemus. According to the chart, Ms. Pacheco had many of the normal discomforts of pregnancy, and in addition considerable anxiety of anticipating another child in the family. She was depressed and stressed beyond normal levels in the pre-delivery setting, as well.

When Ms. Pacheco presented to Labor and Delivery it was immediately apparent that she was suffering a placental abruption (separation of the placenta from the uterine wall) causing her a great deal of pain and endangering her baby's life. In rapid sequence the danger was recognized, and the labor and delivery staff rushed her into the operating room. Little time was wasted in explaining the dire emergency, which was frightening to Ms. Pacheco.

PLAINTIFFS' PRETRIAL STATEMENT
FOR DAMAGES PHASE- 19
Case No.: C15-1175RSL



MAXWELL GRAHAM
535 E SUNSET WAY
ISSAQUAH, WA 98027
206.527.2000
MAXWELLGRAHAM.COM

Normally a cesarean section is done under a regional anesthetic (spinal or epidural) with the patient awake. In this emergency situation, however, general anesthesia (putting her to sleep) was necessary to enable a quick surgical delivery. Due to the anesthesia, Mr. Lemus was not allowed in the OR. Mr. Lemus and Ms. Pacheco were frightened for her life and that of her baby.

When coming out of general anesthesia, there is the sudden return of awareness and the uncertainty of what happened while you were asleep. There is the anxiety of not knowing if the baby survived and the feeling of surgical pain and nausea. In the case of Ms. Pacheco, there was the additional barrier of communication, which reduced the ability to calmly convey reassurances to her.

Post-operative recovery from a cesarean section is lengthy, painful and exhausting. In the hospital she had help, but once home, Ms. Pacheco was taking care of her baby and recovering from surgery. She needed to take pain medication, which can have side effects. She was, no doubt, worried about her infant. She was tired and sleep deprived. Her hormones were out of balance, causing hot flashes and depression.

When the news of the baby's birth defects were discovered there was additional anxiety about the future. There was great anxiety about health and financial issues.

All of these events, emotional trauma, and financial burden would not have happened if the Clinic had properly administered her contraception, and the pregnancy been prevented.

VII.     The Fair General Damages Award for Yesenia and Luis

        a.     Special Damages May be Awarded in the Form of a Ratio of General and Special Damages, per *Wuth.*

An acceptable way to calculate the special damages is to follow Washington precedent in *Wuth v. Laboratory Corp. of America*, 359 P.3d 841 (2015). *Wuth* is the only Washington case

MAXWELL GRAHAM
535 E SUNSET WAY
ISSAQUAH, WA 98027
206.527.2000
MAXWELLGRAHAM.COM

of which we are aware which reports how much a jury was asked to award, and did award, the parents for general damages for emotional distress and mental anguish for raising a genetically defective child. In *Wuth*, the parents wanted a child, but were afraid of genetic defects. They sought genetic testing from Defendants who botched it. The parents relied upon the assurances that they were not at risk of the genetic defects that they feared and bore a child named Oliver whom they loved, but who was also a burden on them due to his disabilities.

The plaintiff attorney in *Wuth* asked the jury to award one-to-one special and general damages. The jury awarded general damages equal to the special damages:

> During closing arguments, the Wuths asked the jury to award $20,628,306 in special damages for Oliver. On Brock and Rhea's claim they requested "nothing less than an amount equal to the award to Ollie... and up to a range of 50 million [dollars]."
> . . .
> Oliver was awarded $25 million in special damages and Brock and Rhea were awarded $25 million in general damages. The trial court entered judgment and denied LabCorp's CR 59 motions to vacate the jury's verdict, amend the judgment or order a new trial.

359 P.3d at 862.

While the special damages claim for Oliver was estimated to be $23,675,000, the jury rounded it to $25,000,000:

> The jury heard expert testimony that Oliver's extraordinary expenses for medical care and specialized training could amount to $23,675,000 over his remaining 70-year life expectancy. The jury also heard testimony that the estimates of Oliver's extraordinary expenses could not possibly "include all of the components of ... the extraordinary care [Oliver] requires because of his disability," that "future medical expenses [are] reasonably certain to be incurred," and that on a more probable than not basis Oliver will likely benefit from future medical advances that will require additional funds.

359 P.3d at 864.

PLAINTIFFS' PRETRIAL STATEMENT
FOR DAMAGES PHASE- 21
Case No.: C15-1175RSL



MAXWELL GRAHAM
535 E SUNSET WAY
ISSAQUAH, WA 98027
206.527.2000
MAXWELLGRAHAM.COM

The defendant in *Wuth* appealed the verdict claiming that it "shocked the conscience." The Washington Supreme Court rejected this argument, finding that the verdict was warranted by the "intense and personal distress" felt by the parents:

> Next, LabCorp argues that Brock and Rhea's award shocks the conscience. We disagree. The noneconomic damages award in this case is analogous to the award affirmed in *Bunch,* 155 Wash.2d at 181-81, 116 P.3d 381, where the jury awarded noneconomic damages that were roughly 75 percent of the amount of the awarded economic damages. And the roughly one to one ratio of economic damages to noneconomic damages here is nowhere near the ten to one ratio we found shocking in *Hill v. GTE Directories Sales Corp.,* 71 Wn.App. 132, 856 P.2d 746 (1993). Moreover, given the intense and persistent distress felt by the parents in this case, the jury's award is not "so excessive as to be `flagrantly outrageous and extravagant,' particularly in light of the strong presumption we accord to jury verdicts." *Bunch,* 155 Wash.2d at 182, 116 P.3d 381.

Id.

In Washington, the trier of fact determines damages based upon the evidence presented at trial, which is personal to each claim. The Court is well within its discretion to award significantly more than a one-to-one ratio. A two-to-one ratio is also appropriate. The concept of virtually unlimited discretion is explained in *Sofie v. Fibreboard Corp.,* 771 P.2d 711 (1989):

> The present case is not the first time we have recognized the constitutional nature of the jury's damage-determining role. In *James v. Robeck,* 79 Wn.2d 864, 869, 490 P.2d 878 (1971), we stated: "To the jury is consigned under the constitution the ultimate power to weigh the evidence and determine the facts — and the amount of damages in a particular case is an ultimate fact." *See also Dacres v. Oregon Ry. & Nav. Co.,* 1 Wn. 525, 20 P. 601 (1889) (Act of 1883, creating a scheme for determining the value of train-killed animals by appraisers, was unconstitutional because it denied the right to a jury trial); *Worthington v. Caldwell,* 65 Wn.2d 269, 273, 396 P.2d 797 (1964) ("Questions of damages should be decided by the jury ..."); *Anderson v. Dalton,* 40 Wn.2d 894, 897, 246 P.2d 853, 35 A.L.R.2d 302 (1952); *Kellerher v. Porter,* 29 Wn.2d 650, 189 P.2d 223 (1948); *Walker v. McNeill,* 17 Wn. 582, 592-95, 50 P. 518 (1897).

> The jury's role in determining noneconomic damages is perhaps even more essential. In *Bingaman v. Grays Harbor Comm'ty Hosp.,* 103 Wn.2d 831, 835, 699 P.2d 1230 (1985), the husband of a woman who died painfully 35 hours

PLAINTIFFS' PRETRIAL STATEMENT
FOR DAMAGES PHASE- 22
Case No.: C15-1175RSL

M|G

MAXWELL GRAHAM
535 E SUNSET WAY
ISSAQUAH, WA 98027
206.527.2000
MAXWELLGRAHAM.COM

after giving birth, the result of medical malpractice, brought a wrongful death and survival action. The only issue before this court was whether the trial judge had properly reduced the jury's damage verdict of $412,000 for the woman's pain and suffering. In resolving the issue in the plaintiff's favor, we stated: "The determination of the amount of damages, *particularly in actions of this nature,* is primarily and peculiarly within the province of the jury, under proper instructions ..." (Italics ours.) 103 Wn.2d at 835. *See also Lyster v. Metzger,* 68 Wn.2d 216, 224-25, 412 P.2d 340 (1966) (issue of damages, here primarily noneconomic, is within the jury's province); *Power v. Union Pac. R.R.,* 655 F.2d 1380,

A general damages range of $9,300,000 (comprised of $4,650,000 for Yesenia and $4,650,000 for Luis) to $18,600,000 (comprised of $9,300,000 for Yesenia and $9,300,000 for Luis) is reasonable, given that the *Wuth* jury found reasonable and appropriate, and the Washington Supreme Court approved, a one to one ratio of general and special damages. The high end of $18,600,000 is less than the general damages award in *Wuth.*

The Bill Brandt economic analysis values the life care plan in the amount of $9,330,033 - $9,352,046. If the Court were to follow the *Wuth* suggestion of a one-to-one ratio, then a general damages verdict of $9,300,000 (comprised of $4,650,000 for Yesenia and $4,650,000 for Luis) would be appropriate.

The method that the jury was asked to calculate special damages *Wuth* was a one to one ratio of general to special damages. Therefore, for general damages, we request an award for a range of a 1-to-1 ratio on the low end to a 2-to-1 ratio of general to special damages on the high end. The high end of that range is $18,600,000 and the low end of that range is $9,300,000. The reason for this is the impact of unintended pregnancy and birth of SLP as summarized below:

1.      The loss of a normal conjugal relationship due to having the need to have SLP near them at night and listen for any unexpected movements.



2.     Experiencing constant fear and hypervigilance regarding the safety of their daughter due to the concern that any small thing like a fever or stress or fatigue could bring on a seizure.

3.     Loss of the ability to go out and experience social activities as a couple and a family outside of visiting their extended family.

4.     Yesenia has lost the ability to ever pursue her dreams of attending school to learn English and pursue career goals of working up the career ladder in a fast food chain.

5.     Intense emotional distress during the first two years of SLP's life due to her frequent seizures and extended hospital stays.

6.     Ongoing fear, lack of certainty and lack of resources for SLP's future will continue to be a source of stress.

7.     Lack of opportunities to fully support their older two daughters, Stephanie and JLP due to the level of care needed for SLP.

b.     <u>Special Damages May Be Awarded *Per Diem*</u>.

As an alternative to the ratio method, the Court may consider a per diem award. In addressing a defense objection to a per diem award, the Washington Supreme Court ruled in 1960

> There is no precise yardstick by which the monetary value of pain and suffering may be determined. Yet, a person suffering pain from the negligence of another may recover therefor. The jury must determine that amount guided only by ordinary experience. . . . We neither approve nor disapprove of the argument in general. Each case must depend upon its own circumstances.

*Jones v. Hogan*, 56 Wn.2d 23, 32, 351 P.2d 153 (1960).

---

PLAINTIFFS' PRETRIAL STATEMENT
FOR DAMAGES PHASE- 24
Case No.: C15-1175RSL



MAXWELL GRAHAM
535 E SUNSET WAY
ISSAQUAH, WA 98027
206.527.2000
MAXWELLGRAHAM.COM

Invoking the per *diem* damages measurement, we request an award of $100,000 per year, per parent, for 60 years. ($100,000 x 60 = $6,000,000.) This is an award of $6,000,000 for Yesenia, and $6,000,000 for Luis.

Yesenia and Luis now have a disabled child that they will need to protect, manage, and take care of for the rest of their lives. "In addition, the damages may compensate for mental anguish and emotional stress suffered by the parents during each child's life as a proximate result of the physicians' negligence. *Harbeson v. Parke-Davis*, 98 Wash.2d 460, 477.

Yesenia and Luis are now 33 years of age. A 33 year old female has a 49 year life expectancy, and a 33 year old male has a 45 year life expectancy.[3] They were both 25 years of age in August, 2012 when SLP was born. Assuming that they both survive into their mid 80's, SLP is now and will be for each of them a blessing and a burden for approximately 60 years.

$100,000 per year for mental anguish and emotional distress for a sixty year period is an amount that loses value over time, given the corrosive effect of inflation. For example, the median price of a home in Seattle in the year 2020 is $768,000.[4] In 1960, the median price for a house in the State of Washington was $11,700[5], which is consistent with the national median home price in 1960 of $11,900.[6] Using that example to show the effect of inflation, a dollar today is worth 1.5% of what it was worth 60 years ago. ($11,900 / $768,000 = .015) If the economy over next 60 years reflects the past 60 years, then the $100,000 awarded to Yesenia and Luis per year will have the buying power of only $1,500 in the year 2080.  ($100,000 x .015 = $1,500).

VIII.    The Court Should Find the Plaintiff's Life Care Plan More Persuasive than the Defendant's Life Care Plan.

---

[3] https://www.insurance.wa.gov/sites/default/files/2017-07/single-life-based-on-2010-us-population-mortality-life-expectancy-tables-1a-through-1h.pdf
[4] https://www.zillow.com/seattle-wa/home-values/
[5] https://www.census.gov/hhes/www/housing/census/historic/values.html
[6] https://www.curbed.com/2018/4/10/17219786/buying-a-house-mortgage-government-gi-bill



1
2
3
4

The Defendant's life care plan of Ms. Bellerive is based on the opinions of Defendant's neuropsychologist, Tye Hunter, PhD. There are several weaknesses in Dr. Hunter's opinions. Dr. Hunter is not a clinical child psychologist. He is a generalist, not a specialist.

5
6
7
8
9
10
11
12
13
14

Dr. Hunter subjected SLP to tests which are not normed for children, such as the Montreal Cognitve Assessment (MOCA). The MOCA is designed to test for dementia, typically in the elderly or the brain injured. It is not designed to test for mental retardation. Dr. Hunter neglected to issue an IQ test, which is the gold standard to determine whether the subject is mentally retarded. Dr. Hunter's report is full of unfounded speculation that SLP's mental condition may improve with remediation. Not only has SLP failed to improve, but also she has a genetic malformation in her brain that cannot improve with time or remediation. The Court should find that Dr. Hunter has little credibility, and the life care plan based on his speculation is not persuasive.

15
16
17
18

In addition, part of the Defendant's smaller life care plan is based on a claim that SLP will have no future special damages since she can live with her parents free of charge. The Plaintiffs moved in limine to strike this argument, and the Court struck it. Dkt. 168.

19
20

Based on this, the Court should have little trouble in finding that the Plaintiff's life care plan is more compelling than the Defendant's.

21

IX. <u>Trial Motions</u>

22
23

Each party has motions that it wishes the Court to rule on. Plaintiffs ask the Court to rule as follows.

24
25

a.     <u>The Court Should Deny Defendant's Motion to Impose a Medical Reversionary Trust.</u>

26



Defendant cites Washington's periodic payment law, RCW 4.56.260, as the source of the Court's authority to impose a medical reversionary trust, RCW 4.56.260. This statute confers no such authority. Indeed, words "medical", "reversionary" and "trust" do not appear in the statute. The Court should deny Defendant's request.

Instead, the attorneys for the Plaintiffs intend to place the funds allocated to SLP's special damages into a special needs trust for SLP, and to create a structured settlement within the special needs trust. Doing so will protect SLP's eligibility for government benefits, will provide her easier access for her medical and non-medical needs and will not revert to the party whose negligence created the injury complained of.

      b.    <u>The Court Should Not Admit the Lien Amount.</u>

The Plaintiffs stipulate that the bills for past medical care have been paid by another source, and that there is a repayment obligation. However, the amount of the repayment obligation is inadmissible under Washington's collateral source rule. RCW 7.70.080 does not allow for the admission of the lien amount.

      c.    <u>The Court Should not Admit Yesenia Pacheco's Labor and Industry Records.</u>

Such records, though discoverable, are confidential and inadmissible. RCW 51.28.070 (1); <u>Mebust vs. Mayco Industries</u>; 8 Wn App. 359, 506 P.2d 326 (1973). "And we agree that if RCW <u>50.12.110</u> establishes a "rule of evidence" which makes a personal injury plaintiff's employment security file inadmissible at trial, RCW <u>51.28.070</u> likewise establishes a similar rule for a personal injury plaintiff's industrial insurance file."

      d.    <u>The Court Should Not Admit Evidence that Yesenia Pacheco was the Victim of Domestic Violence Perpetuated by her Brother.</u>



MAXWELL GRAHAM
535 E SUNSET WAY
ISSAQUAH, WA 98027
206.527.2000
MAXWELLGRAHAM.COM

The Court should deny evidence of domestic violence by Ms. Pacheco's brother as irrelevant because her brother is not a party to this action, and also because such violence is represented to have occurred in the medical records prior to SLP's birth.

e.    The Court Should Deny Admission of Evidence that Yesenia Pacheco was a Victim of Domestic Violence Perpetuated by Luis Lemus that Occurred Prior to SLP's Birth.

Defendant intends to introduce medical records dating to 2009 or earlier which contain references to domestic violence that Luis Lemus perpetuated on Yesenia Pacheco. This violence, if it occurred, occurred more than ten years ago, and is therefore too remote to have probative value. It also is not relevant, because it occurred prior to SLP's birth.

f.    The Court Should Allow Dr. Zimmer to Testify to his Report of March, 2020 in the Interest of Even Application of Justice.

Defendant's expert, Tye Hunter, PhD disclosed new opinions on May 18, 2020 and on August 17, 2020. If Defendant is allowed to present late disclosed expert testimony at trial (indeed a new report one month prior to trial), Plaintiffs should be allowed the same.

In the interest of even handed application of justice, the Court should allow Plaintiffs to present the testimony Dr. Zimmer which was presented in his report of March 31, 2020. This would allow both sides to present their experts, with the Plaintiffs presenting the testimony of Dr. Zimmer, and the Defendant presenting the testimony of Dr. Hunter, so that the Court can make the most informed decision possible.

This motion is based on the principle that the best decision that the Court can make is the most informed decision. It is also based on the principle that justice is offended if the Court imposes a lax standard for the Defendant, which allows for late disclosed expert opinions, but a strict standard for the Plaintiffs, which prohibits late disclosed expert opinions.

//

//

PLAINTIFFS' PRETRIAL STATEMENT
FOR DAMAGES PHASE- 28
Case No.: C15-1175RSL



MAXWELL GRAHAM
535 E SUNSET WAY
ISSAQUAH, WA 98027
206.527.2000
MAXWELLGRAHAM.COM

1

2 DATED this 8th day of September, 2020.

3

4        MAXWELL GRAHAM                    ALVAREZ LAW

5

6        s/ Michael Maxwell                s/ Steve Ralph Alvarez
         Michael Maxwell, WSBA#21781       Steve Ralph Alvarez, WSBA # 23051
7        Attorney for Plaintiffs           Attorney for Plaintiffs
         535 East Sunset Way               705 S. 9th St., Ste. 304
8        Issaquah, WA 98027                Tacoma, WA 98405-4600
         mike@maxwellgraham.com            Steve@alvarezlaw.com
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

PLAINTIFFS' PRETRIAL STATEMENT
FOR DAMAGES PHASE- 29
Case No.: C15-1175RSL



MAXWELL GRAHAM
535 E SUNSET WAY
ISSAQUAH, WA 98027
206.527.2000
MAXWELLGRAHAM.COM