1                                District Judge Robert S. Lasnik

2

3

4

5

6

7           UNITED STATES DISTRICT COURT FOR THE
             WESTERN DISTRICT OF WASHINGTON
8                      AT SEATTLE

9

10  YESENIA PACHECO, *et al.*,           CASE NO. C15-1175 RSL

11                  Plaintiffs,      UNITED STATES' TRIAL BRIEF
            v.                   RE: DAMAGES
12

13  UNITED STATES OF AMERICA,

                     Defendant.
14

15       Defendant, the United States of America, by and through its counsel, Brian T. Moran,

16  United States Attorney for the Western District of Washington, Kristen R. Vogel, and Matt

17  Waldrop, Assistant United States Attorneys for said District, hereby submits its trial brief in this

18  matter.

19                      **I.**      **INTRODUCTION**

20       This is a wrongful birth and wrongful life case arising out of care provided to Yesenia

21  Pacheco at the NeighborCare Health Clinic (the "Clinic"), a federally-funded community health

22  center in Seattle, Washington. On January 23, 2020, following a two-day trial on liability, the

23  Court found that the United States was negligent in failing to administer a birth control injection

    to Ms. Pacheco on September 30, 2011, resulting in an unwanted pregnancy. Dkt. 134. The Court

UNITED STATES' TRIAL BRIEF
RE: DAMAGES
C15-1175 RSL - 1

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

determined that Ms. Pacheco's unintended pregnancy and subsequent birth of SLP were both foreseeable consequences of this negligence. *Id.* The Court further determined that the risk that a child will be born with a rare medical condition or disability, as was SLP, was within the general field of danger that arises when a medical provider fails to use reasonable care in a procedure designed to prevent pregnancy. *Id.*

On September 14, 2020, the Court will conduct a five-day bench trial regarding damages. Ms. Pacheco and Luis Lemus, who is the father of SLP, both seek general damages for the mental pain and suffering they have experienced as a result of SLP's wrongful birth. Minor Plaintiff SLP seeks special damages for the costs of her future extraordinary medical care and special training. Ms. Pacheco and SLP also seek special damages for past medical expenses incurred as a result of her pregnancy and the birth of SLP, along with SLP's past extraordinary medical expenses. Having already determined that the Clinic was liable for the unintended birth of SLP, the Court must now determine the appropriate amount of damages to be awarded to Plaintiffs.

The United States is cognizant of the sensitive nature of some of the facts it brings to the Court's attention. While the parties may diverge on the importance of these facts, they deserve full consideration as the Court determines how to award appropriate damages as required by Washington law, including creation of a medical reversionary trust for any award of special damages related to SLP's future extraordinary care under the state's periodic payment statute.

That being said, the parties have reached a general understanding on other important issues. For example, the Court will hear consistent testimony that SLP is a beautiful, loving, and good-natured child who brings immense joy to her family who loves her. The parties also agree that SLP's rare and unforeseen birth defect known as bilateral perisylvian polymicrogyria ("PMG") contributes to her cognitive delays and epilepsy, and that she will most likely require at least some

UNITED STATES' TRIAL BRIEF
RE: DAMAGES
C15-1175 RSL - 2

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

level of medical care or other supervision to address these delays and provide assistance for the rest of her life. Both parties also agree that the Court's overriding priority should be assuring adequate provision and protection for SLP's future extraordinary care, the scope and length of which remains unknown.

Over five days of trial, the Court will hear testimony from the parties, expert neurologists, neuropsychologists, economists, ophthalmologists, optometrists, and life care planners. However, neither the parties nor their experts know what SLP's future holds. Based on that uncertainty, the United States respectfully requests the Court consider the analysis provided at trial regarding each recoverable category of damages and adopt this approach as the most reasonable and fair method in making its determination on an award of special and general damages in this case.

## II.    FACTS

Minor plaintiff SLP was born on August 2, 2012 in Seattle, Washington, to Yesenia Pacheco and Luis Lemus. Ms. Pacheco and Mr. Lemus are both citizens of El Salvador and Spanish is their primary language. Ms. Pacheco left school in El Salvador in the 5th grade. Mr. Lemus left school in Seattle in the 11th grade. Ms. Pacheco has worked in the fast food industry, but currently works part-time as a house cleaner, while also maintaining the couple's home and caring for their three children. Mr. Lemus has held a wide variety of jobs, typically involving manual labor. SLP has two older sisters, both of whom were born without any birth defects and are otherwise healthy. The family lives in Everett, Washington.

### A.    Ms. Pacheco's Pregnancy and Childbirth

In December 2011, Ms. Pacheco took a pregnancy test and found out she was pregnant with SLP. At the time, Ms. Pacheco was in a relationship with Mr. Lemus, whom she already shared one daughter with. Ms. Pacheco also had another daughter from a prior relationship. Mr.

UNITED STATES' TRIAL BRIEF
RE: DAMAGES
C15-1175 RSL - 3

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Lemus, who wanted more children, was very happy when he learned about Ms. Pacheco's pregnancy. At the time, however, Ms. Pacheco did not want more children.

Ms. Pacheco's pregnancy was mostly uncomplicated with a few exceptions. During her pregnancy, Ms. Pacheco was diagnosed with gestational diabetes. She also endured physical and emotional abuse from Mr. Lemus. In June 2012, a mandatory report was made to Washington State's Child Protective Services ("CPS") after Ms. Pacheco reported concerns to her social worker that Mr. Lemus was verbally abusive with her and her two children for no apparent reason. Ms. Pacheco stated that Mr. Lemus yelled at the children, insulted them, and had lost his temper and tolerance with their 3-year-old, who he had been hurting by pinching her. She also reported that Mr. Lemus was no longer using drugs but was drinking on the weekends. Ms. Pacheco reported that in April 2012, while she was pregnant with SLP, Mr. Lemus was very drunk and pulled her hair, spilled lighter fluid on her hair, and threatened to start a fire on her. She also reported that he hurt her oldest daughter by pulling her hair.

Unfortunately, Ms. Pacheco was not unfamiliar with domestic violence by 2012. Her medical records reflect that Mr. Lemus was also emotionally and physically abusive to her during the pregnancy of their second child, necessitating a visit to the emergency room after he kicked her in the stomach. Also during her second pregnancy, Ms. Pacheco reported that Mr. Lemus would leave for multiple days at a time to drink and smoke pot, and would return home and become violent after he had been drinking. She also reported that he punched her in her lower abdomen twice when she was sixteen weeks pregnant, but did not want to make a report for fear of retaliation. After her second child was born, Ms. Pacheco reported that Mr. Lemus hit her head and took her apartment keys, broke the glass of her car, and ran over her foot. On multiple

UNITED STATES' TRIAL BRIEF
RE: DAMAGES
C15-1175 RSL - 4

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

occasions, Ms. Pacheco also reported prior physical and emotional by both her brother and the father of her first child.

On August 2, 2012, Ms. Pacheco, who was nine months pregnant with SLP, was admitted to Swedish Medical Center. At that time, she was not in labor but reported that she and the baby were "dying." Complications arose during the course of generating labor that ultimately resulted in delivery of SLP by caesarean section. Ms. Pacheco was discharged four days after giving birth to SLP. She suffered no complications from the caesarean section.

Shortly after delivery, SLP began experiencing tremors and seizures and remained hospitalized for approximately 10 days after birth. A subsequent brain MRI for SLP on day 4 of life revealed left, unilateral PMG, a rare neurological disorder that affects the cerebral cortex of the brain. Seattle Children's Hospital initiated genetic evaluations of SLP. These initial genetic evaluations (microarray and cytomegalovirus) failed to reveal a specific etiology. Neurologists at Seattle Children's Hospital eventually diagnosed SLP with bilateral PMG. Neither parents' families have a history of genetic birth defects.

PMG is a condition characterized by abnormal development of the brain before birth. The surface of the brain normally has many ridges or folds, called gyri. In children born with PMG, the brain develops too many folds, and the folds are unusually small. Symptoms of PMG generally include difficulty speaking, swallowing, epilepsy, developmental delays, and mild to severe intellectual disability. This diagnosis does not affect SLP's life expectancy.

B.    SLP's Early Years

Within two months of being born SLP's seizures required neuro-diagnostic imaging and neuropsychological studies. SLP also demonstrated mild right-sided motor weakness associated with her PMG. Over the next few years, multiple hospitalizations and medication adjustments were

UNITED STATES' TRIAL BRIEF
RE: DAMAGES
C15-1175 RSL - 5

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

required to generate satisfactory seizure control. SLP's developmental history also included walking by 18 months and two word sentences by age 3. She was using colors and pencils and had developed some disarticulation with her speech noted at age 4. SLP also suffered from frequent upper respiratory illnesses which required medical treatment.

By May of 2017, when SLP was 5 years and 9 months, she was climbing stairs with balance difficulties but peddling a tricycle. Records reflect a very subtle decrease in fine motor on the right upper extremity. Nocturnal body jerks were reported by the family, but were never confirmed on a 48-hour EEG to be epileptic. SLP also began attending kindergarten in 2017 at Horizon Elementary School in Mukilteo, Washington.

In February of 2018, SLP received an essentially normal neurologic examination at Seattle Children's. By October of 2018 when SLP was 6 years and 2 months, she had no recent hospitalizations. She was receiving two pills twice daily (Levetiracetam and Oxcarbazepine) that provided adequate control of her seizures. SLP's parents reported that she did not require equipment for support, but supervision was necessary for monitoring daily activities, which included dressing and toiletry, but not feeding or nutrition.

Also in October of 2018, she was examined by Dr. Jerry Tomasovic, Defendant's expert neurologist, and Dr. Tye Hunter, Defendant's expert forensic psychologist. Dr. Tomasovic reported that SLP was able to comprehend basic motor commands but was functioning below average for her chronological age. Dr. Tomasovic agreed with Plaintiff's expert neuropsychologist, Dr. Deborah Hill, that SLP identified on the WISC-V[1] a full scale I.Q. of 70 (borderline impaired or delayed), which was consistent with SLP's school records confirming

---

[1] The WISC-V is an individually administered and comprehensive clinical instrument used to assess the general thinking and reasoning skills of children aged six years to 16 years.

UNITED STATES' TRIAL BRIEF
RE: DAMAGES
C15-1175 RSL - 6

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

broad academic difficulties in reading, math, and writing. Dr. Hunter reported that he also concurs with Dr. Hill's diagnoses of SLP's language disorder and intellectual disability and acknowledges that at this time she is slower in all areas of development and in social skills and daily living skills than her peers.

C.      SLP's Current Condition

SLP just turned eight years old. She is now beginning third grade at Horizon elementary in the Mukilteo School District. SLP participates in a mix of special and general education courses. SLP is currently in special education classes for math, reading, and writing 30 minutes a day/four times a week. She also attends occupational therapy once a week for 30 minutes, and speech therapy once a week for 30 minutes. Based on school testing, SLP does not qualify for intervention in physical therapy. In total, SLP spends 420 minutes per week in a special education setting, which compromises approximately 24% of her school week. The other 76% of SLP's school day is spent in general education classes with her peers.

Dr. Hunter re-examined SLP in February 2020 and reviewed updated records from her school. Based on his examinations and records review, Dr. Hunter has concluded that SLP shows mild developmental delay related to learning and some adaptive functions, but does not present with any behavioral or emotional problems or concerns. Dr. Hunter noted that SLP's first grade teacher stated that her adaptive skills were within expectations for her age.  At bottom, Dr. Hunter concluded that SLP has shown improvement in the targeted areas raised in her individualized education plan, and that with continued maturation and intervention, he is of the opinion that SLP will continue to show improvement in areas related to cognitive functioning and activities of daily living.

UNITED STATES' TRIAL BRIEF
RE: DAMAGES
C15-1175 RSL - 7

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1      D.      SLP's Future Status

2      Both Drs. Hunter and Tomasovic believe that SLP's future development is unknown, but

3   that she may be able to learn life skills allowing her to function in daily life with minimal supports.

4   Dr. Tomasovic also opines that SLP will enjoy a degree of independence for activities of daily

5   living but will still require some level of supervision. However, Dr. Hill and Dr. Glass, Plaintiffs'

6   expert pediatric neurologist, will opine that SLP is likely to require a full-time intensive program

7   as an adult, based on their understanding of SLP's cognitive and physical deficits. In other words,

8   Plaintiffs' and Defendant's experts do not necessarily disagree on SLP's current status, but hold

9   varying opinions on what degree of assistance she will need the rest of her life. Unfortunately, it

10  appears that no expert can predict for certain what SLP's future supervision needs will be as there

11  are many currently unknown variables, including what impact continued remediation will have on

12  SLP's cognitive functioning.

13                              **III.      DAMAGES**

14      Under the Federal Tort Claims Act ("FTCA"), the United States shall be liable for tort

15  claims "for injury . . . caused by the negligent or wrongful act or omission of any employee of the

16  Government while acting within the scope of his office or employment, under circumstances where

17  the United States, if a private person, would be liable to the claimant in accordance with the law

18  of the place where the act or commission occurred." 28 U.S.C. § 1346(b).

19      The United States shall be liable for tort claims only "in the same manner and to the same

20  extent as a private individual under like circumstances, but shall not be liable for interest prior to

21  judgment or for punitive damages." 28 U.S.C. § 2674. Because the Plaintiffs' alleged injuries

22  occurred in Seattle, Washington, the substantive law of Washington State applies in this case.

23

UNITED STATES' TRIAL BRIEF
RE: DAMAGES
C15-1175 RSL - 8

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Plaintiffs Pacheco and Lemus seek general damages for claims for wrongful birth, and minor Plaintiff SLP seeks special damages for a claim for wrongful life. Ms. Pacheco and SLP also seek special damages for past medical expenses incurred as a result of her pregnancy and the birth of SLP, along with SLP's past extraordinary medical expenses.

## A.      GENERAL DAMAGES

"General damages are those which are the natural and necessary result of the wrongful act or omission asserted as the basis for liability. They are presumed by or implied in law to have resulted from the injury." *Jensen v. Torr*, 44 Wash. App. 207, 215, 721 P.2d 992 (1986). In Washington State, there is no "per se rule that general damages must be awarded to every plaintiff who sustains an injury[.]" *Palmer v. Jensen*, 937 P.2d 597, 601 (Wash. 1997). Instead, a plaintiff must substantiate their general damages claim with affirmative evidence. *Id.*  A court "may award special damages and no general damages when 'the record would support of verdict omitting general damages.'" *Geston v. Scott*, 67 P.3d 496, 498 (Wash. Ct. App. 2003) (quoting *Jensen*, 937 P.2d at 601.

### 1.      Plaintiffs' Wrongful Birth Claims

In this case, only Plaintiffs Pacheco and Lemus are entitled to an award of general damages for their wrongful birth claims. *See Harbeson v. Parke-Davis, Inc.*, 656 P.2d 483, 496 (Wash. 1983) ("General damages [for a claim of wrongful life like SLP's] are certainly beyond computation."). General damages awarded under a claim of wrongful birth include compensation for "mental anguish and emotional stress suffered by the parents during" the child's life, offset by "[a]ny emotional benefits to the parents resulting from the birth of the child[.]" *Id.* at 494.

"Wrongful birth is an action by the parents on their own behalf to recover damages for the birth of an impaired child when the impairment results either from an act or omission of the

UNITED STATES' TRIAL BRIEF
RE: DAMAGES
C15-1175 RSL - 9

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

defendant or because the defendant failed to diagnose or discover a genetic defect . . . in the parents or the infant in time to obtain a eugenic abortion or to prevent the pregnancy all together." *Smith v. Gore*, 728 S.W.2d 738, 741 (Tenn. 1987) (collecting cases).[2] "In a wrongful-birth action, parents of a child born with a **detectable** birth defect allege that they would have avoided conception or terminated the pregnancy but for the physician's negligent failure to inform them of the likelihood of the birth defect." *Plowman v. Fort Madison Comm. Hosp.*, 896 N.W.2d 393, 399 (Iowa 2017) (citing *Keel v. Branch*, 624 So.2d 1022, 1024 (Ala. 1993)) (emphasis added). "The compensable injury in a wrongful-birth claim is the parents' loss of the opportunity to make an informed decision to terminate the pregnancy." *Id.* at 403.

In this case, the Court will hear testimony and review evidence that clearly demonstrates Ms. Pacheco and Mr. Lemus receive overwhelming emotional benefit and joy from having SLP in their life.[3] Every witness agrees that SLP is a sweet child with a sunny disposition and a strong will to try. This description is also supported by the records from Horizon Elementary. All of this should be considered by the Court in making its decision on any award of general damages to Ms. Pacheco and Mr. Lemus.

---

[2] This is in contrast to an action for wrongful pregnancy, which is "brought by the parents on their own behalf to recover damages resulting from a failed pregnancy avoidance technique." *Id.*

[3] To the extent Plaintiffs are seeking to recover general damages for any physical pain and suffering Ms. Pacheco experienced as a result of SLP's birth via caesarean section, those damages are not recoverable in Washington State under a claim of wrongful birth. *See Harbeson*, 98 Wash. 2d at 477 ("In other words, the parents should recover those expenses in excess of the cost of the birth and rearing of two normal children. In addition, the damages may compensate for mental anguish and emotional stress suffered by the parents during each child's life as a proximate result of the physicians' negligence.").

There is no mention in *Harbeson* of recovery of general damages arising from the physical pain and suffering resulting from the wrongful pregnancy itself.   It is unclear under Washington law whether a plaintiff may bring both a claim for wrongful birth and wrongful pregnancy.  *See Harbeson*, 98 Wash. 2d at 488 (noting that claims for wrongful pregnancy involve negligence that leads to the birth of a healthy child, and are separate from actions for wrongful birth).

UNITED STATES' TRIAL BRIEF
RE: DAMAGES
C15-1175 RSL - 10

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

It is anticipated that Plaintiffs, relying heavily on *Wuth v. Laboratory Corporation of America*, will argue they are each entitled to general damages in an amount equal to, or in excess of the special damages awarded to SLP for her future extraordinary medical care costs. However, the facts here differ substantially from those in *Wuth*, where a King County jury awarded approximately $25 million in general damages to the parents of Oliver Wuth as compensation for their mental anguish and emotional distress arising from their wrongful birth claims. 189 Wash. App. 600, 681-82, 359 P.3d 841 (2015). A brief summary of the facts of *Wuth* is important for understanding why the situation here is not similar at all.

Mr. Wuth's family had a history of birth defects, including his first cousin, who had profound disabilities. *Id.* at 668. By 2003, technology was developed that allowed for a diagnosis of why that first cousin developed these rare disabilities. *Id.* The testing concluded that the defects were caused by a chromosomal anomaly. *Id.* at 669. Mr. Wuth underwent genetic testing that revealed he had the same chromosomal anomaly, but was asymptomatic. *Id.* The Wuths wanted to have additional children, and consulted with a genetic counselor, who advised the couple there was a 50% chance their future child could have the same chromosomal anomaly, but that there was genetic testing available that would detect this anomaly prior to birth and allow the Wuths to decide whether to carry the fetus to term. *Id.* at 670. The genetic counselor provided the Wuths with a detailed report, which they brought to each and every pregnancy-related medical appointment. *Id.*

After this genetic consultation, the Wuths concluded that they did not want to bring a fetus with those genetic disabilities to term, and were clear about this with all of their providers. *Id.* In November 2007, Ms. Wuth became pregnant with the fetus that would become Oliver. *Id.* The couple was anxious about this pregnancy, and told Ms. Wuth's obstetrician about the genetic

UNITED STATES' TRIAL BRIEF
RE: DAMAGES
C15-1175 RSL - 11

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   anomaly and specifically stated they would not bring a fetus with this defect to term. *Id.* Given

2   that information, the OB scheduled the fetus to be tested for the chromosomal anomaly. *Id.* at 670-

3   71.

4       The testing procedure for the chromosomal anomaly must be performed prior to the end of

5   the 13th week of pregnancy, and Ms. Wuth was twelve weeks and one day pregnant when the

6   procedure was eventually scheduled. *Id.* at 671. The procedure obtained sufficient genetic samples

7   from the fetus, however, there was no genetic counselor working on the date of Ms. Wuth's

8   procedure. *Id.* at 671-72. The genetic counselor would have been the individual that completes the

9   forms for ordering the relevant lab work to test for the chromosomal anomaly. *Id.* Instead, on the

10  day of the Wuth's appointment, a medical assistant completed these forms, and it was undisputed

11  that she failed to provide the genetic report that had previously identified the chromosomal

12  anomaly Mr. Wuth's family suffered from and failed to order the proper test to screen for that

13  anomaly. *Id.* at 672.

14      Once the fetal tissue sample arrived at the lab, a technician-in-training failed to properly

15  read the form and also failed to follow up with the Wuths regarding what specific genetic testing

16  was to be performed. *Id.* at 673. It was also undisputed that the lab had a policy requiring that a

17  supervisor double-check the testing performed by technicians-in-training, but that the policy was

18  not followed in the Wuth's case. *Id.* at 674.

19      Following the genetic testing, the results came back negative for the fetus carrying the

20  concerning chromosomal anomaly. *Id.* Those results, which were incorrect, were provided to the

21  Wuths, who were overjoyed. *Id.* at 674-76. According to testimony at trial, the Wuths "spent the

22  duration of Rhea's pregnancy excitedly expecting the arrival of a healthy baby boy." *Id.* at 676.

23

UNITED STATES' TRIAL BRIEF
RE: DAMAGES
C15-1175 RSL - 12

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

When Oliver was born, it was "immediately clear that he had severe physical and cognitive defects." *Id.*

Oliver Wuth was "born with severe birth defects" and at birth he looked "looked vacant and broken." *Id.* at 667. Oliver Wuth was "not physically proportional—his feet and toes were tiny; his fingers were long, but his hands were very small." He had inverted nipples and a buried penis." *Id.* at 668. His head was bent and turned, and the muscles and tendons were "so tight that his legs would not straighten." *Id.* As an infant, Oliver did not feed properly and rapidly lost weight. *Id.* He also failed to reach many early life milestones, like toilet training and language development. *Id.* At the time of trial, Oliver could not walk up stairs or run. *Id.* His vision, judgment and fine motor skills remained severely impaired, and his brain was underdeveloped and small. *Id.*

By contrast to the countless negligent errors committed in *Wuth*, the negligence here was the Defendant's one-time failure to properly administer a DepoProvera shot to Ms. Pacheco. There was no evidence that Plaintiffs were concerned about genetic defects, that Ms. Pacheco had received any abnormal genetic testing that she was not informed about, or that Ms. Pacheco and Mr. Lemus were concerned about avoiding the birth of a child with severe disabilities based on a family history of genetic defects. Furthermore, the profound physical and cognitive delays that Oliver Wuth suffered from are not present here. SLP spends the overwhelming majority of her time in general education classes. She is able to feed herself, communicate with her family, friends and teachers, and perform many activities that are typical for an eight-year old.

Accordingly, the award of general damages to the parents in *Wuth* is not a reliable comparator. Furthermore, even other cases with fact patterns more similar to *Wuth* than this case also demonstrate that *Wuth*'s general damages award is a clear outlier. For example, in *Plowman*

UNITED STATES' TRIAL BRIEF
RE: DAMAGES
C15-1175 RSL - 13

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

*v. Fort Madison Community Hospital*, defendant failed to notify the Plowmans that an ultrasound indicated head abnormalities and required additional genetic follow-up. 896 N.W. 393, 396 (Iowa 2017). After assurances that the baby was healthy and relying on those assurances, two months after his birth it was determined that the infant suffered from cerebral palsy, microcephaly, intellectual disabilities and seizures. *Id.* at 397. The Plowman child will never walk or speak. *Id.* Based on those facts, an Iowa jury awarded approximately $2.8 million in general damages, which was substantially less than the special damages awarded to the Plowman child for his future extraordinary care. 2019 WL 586906.

Similarly, a 2015 FTCA matter alleging wrongful birth and wrongful life yielded a verdict of approximately $640,000 for the mother's pain and suffering when a federally-funded health clinic failed to disclose to the mother abnormalities in the fetal ultrasound, and also failed to schedule the mother's follow-up appointment with a perinatal specialist, who might have diagnosed the child's eventual hydrocephaly prior to birth. *See Simms v. United States*, JVR No. 1707060046, 2015 WL 13450974. The child was ultimately born with "a twisted and poorly formed brain stem, hydrocephalus, ventriculomegaly, muscular dystrophy, cerebral palsy, and cobblestone lissencephaly, and remained in a vegetative state after birth. *Id.* This general damage award was also substantially less than the special damages awarded to the child.

These examples demonstrate that a general damages award for a parent need not equal the special damages awarded to the child for future extraordinary medical care. More importantly, unlike any of the cases discussed above, there is no evidence here that the United States negligently failed to inform the Plaintiffs about a potential birth defect, the risk of a birth defect, or any other information that was subsequently relied upon to conceive and carry SLP to term. Instead, the only negligence was the United States' failure to administer a DepoProvera shot. The cases discussed

UNITED STATES' TRIAL BRIEF
RE: DAMAGES
C15-1175 RSL - 14

above also involve children born with severe physical and cognitive deficits, or children who are so disabled they cannot walk or talk.  The physical and cognitive deficits of those children differ in substantial ways from SLP.

Therefore, when deciding what amount of general damages, if any, to award for mental anguish suffered by the Plaintiffs for SLP's wrongful birth, the Court should consider the immense joy SLP brings to their life on a daily basis.

### B.    SPECIAL DAMAGES

"[S]pecial damages must be alleged and proven." *Purvis v. Bremer's, Inc.*, 54 Wash. 2d 743, 747, 344 P.2d 705 (1959). Furthermore, "[t]he items of special damage must be stated with particularity." *Id.* (citing *Denney v. Northwestern Credit Ass'n*, 55 Wash. 331, 104 P. 769 (1909)).

### 1.    Special Damages for Past Extraordinary Medical Expenses

Plaintiffs first seek special damages for past medical expenses incurred during the pregnancy and birth of SLP and for the extraordinary medical care SLP has undergone to-date in the amount of $255,540.[4] In medical malpractice actions such as this one, Washington State has abrogated the common law rule barring admission of collateral source evidence and allows "[a]ny party to present evidence to the trier of fact that the plaintiff has already been compensated for the injury complained of from any source except the assets of the plaintiff, the plaintiffs' representative, or the plaintiff's immediate family." R.C.W. § 7.70.080; *see also Carpenter v. United States*, No. 13-5633-RJB, 2014 WL 3767408, at *2 (W.D. Wash. July 31, 2014) (dismissing plaintiff's claims for past medical costs that had already been paid for by the VA under

---

[4] This special damages figure comes directly from Plaintiffs' economist's NPV Loss chart. However, Plaintiffs have created a spreadsheet under FRE 1006 that purports to summarize all of the medical expenses incurred from SLP's birth and her past extraordinary medical care in the amount of $313,729.17. It is unclear which amount Plaintiffs will seek to recover at trial. However, under Washington law they are entitled to none of these amounts.

UNITED STATES' TRIAL BRIEF
RE: DAMAGES
C15-1175 RSL - 15

Washington's modified collateral source rule because there was no evidence that the plaintiff had actually paid any costs related to his care at the VA). Once a defendant has made a showing that a plaintiff has already been compensated, the burden shifts to the plaintiff to "present evidence of an obligation to repay such compensation and evidence of any amount paid by the plaintiff . . . ." R.C.W. § 7.70.080.   Instead, Plaintiffs seek to improperly recover the total amount billed to Medicaid for these past medical expenses.

Here, it is undisputed that Ms. Pacheco and SLP are Medicaid recipients. The Court will hear testimony from Ms. Pacheco that the family has not incurred any out-of-pocket expense related to the pregnancy, birth, or care of SLP. Furthermore, the Court will see evidence that the current Medicaid liens on Ms. Pacheco's pregnancy, SLP's birth and past medical care, including both ordinary and extraordinary care[5], totals approximately $40,000 in amounts actually paid by Medicaid, and not the more than $250,000 in billings being sought by Plaintiffs as special damages for past medical expenses.   *See* RCW 41.05a.070(2) ("The authority has the right to file a lien upon any recovery by or on behalf of the recipient from such tort feasor or the tort feasor's insurer, or both, to the extent of the value of the assistance ***paid by*** the authority." (emphasis added).

It is Defendant's understanding that Plaintiffs could have possibly obtained a final Medicaid subrogation lien amount prior to trial in order to prove these special damages with the requisite specificity. *See* WAC § 182-501-0100(6)(b). It is unclear why they chose not to do so.

Accordingly, the Court should enter a special damages award that correctly captures the actual amounts paid by Medicaid and owed by Plaintiffs for Ms. Pacheco's pregnancy, SLP's birth and her past extraordinary medical expenses based on the Medicaid liens that will be presented at

---

[5] As will be established at trial, a portion of the past medical expenses being sought by Plaintiffs actually include things like dental procedures and well-child checkups, the kind of ordinary expenses that are not recoverable under a claim for wrongful life or wrongful birth.

UNITED STATES' TRIAL BRIEF
RE: DAMAGES
C15-1175 RSL - 16

1 trial. To award a greater amount would improperly provide Plaintiffs with a windfall in

2 contravention of Washington's modified collateral source rule.

### 2.      Special Damages for SLP's Future Extraordinary Medical Care

4          Under her claim for wrongful life, SLP is only entitled to special damages to "recover the

5 extraordinary expenses to be incurred during the [her] lifetime, as a result of [her] congenital

6 defect." *Harbeson*, 98 Wash. 2d at 479-80 (modification added). An award of special economic

7 damages in the form of future medical care must be "[t]he reasonable value of necessary medical

8 care, treatment, and services with reasonable probability to be required in the future." 6 Wash.

9 Prac., Wash. Pattern Jury Instr. Civ. WPI 30.07.02 (7th ed.).

10         Any award of future medical damages must then be calculated to their present cash value,

11 or "net present value," which means the sum of money needed now which, if invested at a

12 reasonable rate of return, would equal the amount of loss at the time in the future when the

13 expenses must be paid. *See* 6 Wash. Prac., Wash. Pattern Jury Instr. Civ. WPI 34.02 (7th ed.). The

14 rate of interest to be applied in determining present cash value should be that rate which in the

15 Court's judgment is reasonable under all the circumstances. *Id.* The Court should take into

16 consideration the prevailing rates of interest in the area that can reasonably be expected from safe

17 investments that a person of ordinary prudence, but without particular financial experience or skill,

18 can make in this locality. *Id.* In determining present cash value, the Court may also consider

19 decreases in value of money that may be caused by future inflation. *Id.*

20         Both parties have retained experts to opine on SLP's future extraordinary medical needs,

21 and the net present value of those future extraordinary recommendations. The life care plans

22 prepared by the parties have many similarities, but differ most directly on whether SLP needs full-

23 time care once she reaches the age of majority and the reasonable cost of that care.

UNITED STATES' TRIAL BRIEF
RE: DAMAGES
C15-1175 RSL - 17

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

### a.  Recommendations for SLP's Future Extraordinary Care

The parties agree that SLP will need extraordinary future care, including neurological evaluations, medication to control her epilepsy, occupational therapy, speech therapy, and other interventions to aid in her continued development. However, real differences remain as to whether SLP will be able to live independently or semi-independently once she reaches the age of majority, including whether she will need a full time guardian for the rest of her life.

Plaintiffs' experts, Dr. Stephen Glass and Dr. Deborah Hill, provided a series of recommendations about SLP's future extraordinary medical expenses. Dr. Glass, a neurologist, will opine that SLP will be fully dependent on others for aspects of her lifetime care rather than being able to be autonomous and semi-independent as an adult. Dr. Glass bases this opinion on his examination of SLP in October 2018. Dr. Glass will also explain that he is relying on the cognitive evaluations performed by Dr. Hill, a neuropsychologist, in September 2018 and May 2019, more than a year ago. Plaintiffs' experts provide no other outcome for SLP's future aside from a requirement of full-time care for the rest of her life.

Defendant's experts, Dr. Jerry Tomasovic and Dr. Tye Hunter, have also examined SLP on multiple occasions. Dr. Hunter most recently saw SLP in February 2020. Based on these examinations, and after review of her most current academic and medical records, Defendant's experts will testify that SLP's future level of care could take on a range of different outcomes. For example, they will explain at trial that based on their testing and examination, SLP, with 7-10 hours of weekly in-home care, along with monthly case management, may be able to live a semi-autonomous life as an adult. As support for this conclusion of semi-independent living, Dr. Hunter will explain that SLP demonstrates strong adaptive skills and that interventions provided through her school demonstrate clear and demonstrative improvement in several areas of functioning. Dr.

UNITED STATES' TRIAL BRIEF
RE: DAMAGES
C15-1175 RSL - 18

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  Tomasovic will explain that, based on his examination of SLP, she does not demonstrate the

2  dramatic physical impairments noted by Dr. Glass. The Court will also see that Dr. Tomasovic's

3  conclusion on SLP's physical condition is supported by her school records. Based on this,

4  Defendant's experts believe an award covering semi-independent living costs for SLP is

5  appropriate.

6  **b.** **Vision Therapy**

7  The parties do not dispute that SLP also has poor visual acuity. The parties also do not

8  dispute that SLP needs glasses to improve her vision. However, Plaintiffs are also seeking special

9  damages in an additional amount ranging from $179,195 to $194,314 for vision therapy aimed to

10  treat SLP's alleged "convergence insufficiency," a diagnosis she received in November 2018 from

11  Plaintiffs' expert optometrist, Dr. Kadet, who is also her treating provider.[6]

12  Convergence insufficiency is a condition where eye alignment is dysfunctional resulting in

13  double vision, headaches when reading, and a variety of other complications. Here, Dr. Kadet

14  determined that convergence insufficiency contributes to SLP's reading difficulties at school. He

15  recommends pricey treatment sessions to "reprogram" SLP's brain to restore her binocular (two

16  eyes) function and will opine at trial that this treatment will substantially improve her reading

17  inefficiency and general reading difficulties.

18  The Court will learn at trial that approximately one month after Dr. Kadet's November

19  2018 examination, SLP was also seen by a pediatric ophthalmologist at Children's Eye Care, Dr.

20  David Epley. Dr. Epley performed a full pediatric ophthalmic evaluation including a dilated exam

21  on SLP. After his exam, Dr. Epley did not diagnosis SLP with convergence insufficiency. Rather,

22

23

---

[6] SLP was initially referred to Dr. Kadet by Plaintiffs' expert neuropsychologist in connection with this litigation.

UNITED STATES' TRIAL BRIEF
RE: DAMAGES
C15-1175 RSL - 19

he diagnosed SLP with accommodative esotropia, one of the most common types of eye misalignments in children that can be corrected without surgery by wearing spectacles full time. Notably, the Court will learn that Dr. Epley also recommended that SLP stop vision therapy because her learning disability is a result of her PMG, not eye problems. He also explained that there are no well-designed scientific trials verifying the use of vision therapy as beneficial in the treatment of learning issues and better use of SLP's time would be in tutoring to her specific deficits and an Individualized Education Program designed around those deficits.

Defendant's expert pediatric ophthalmologist, Dr. Lee Klombers, will provide further testimony rebutting Dr. Kadet's diagnosis. As Dr. Klombers will explain at trial, not only is vision therapy an unnecessary future cost for SLP, it is not prudent for SLP to endure continued vision therapy that may actually lead to unwarranted frustration for her and her family when her learning disabilities do not improve.

### c. Life Care Plans

According to Plaintiffs' life care plan prepared by Merrill Cohen, the two biggest future recommendations for SLP are an "adult family home" beginning at age 18, and a guardian, beginning at age 18, performing eight hours a month of work. The net present value of these two recommendations make up 72% of the total net present value of Plaintiffs' life care plan.

**Low End of Costs**
**Rank of Life Care Plan Costs (Highest to Lowest)**                          **Schedule 33**
**SLP**
**Date of Injury:  August 2, 2012**

| Rank of LCP Cost | LCP Item No. | Item Description | Cost (NPV) | % of Total Claim | Cumulative Cost (NPV) | Cumulative % of Total Claim |
|---|---|---|---|---|---|---|
| 1 | 20 | Adult Family Home | $5,939,160 | 63.7% | $5,939,160 | 63.7% |
| 2 | 21 | Guardian | $741,689 | 7.9% | $6,680,849 | 71.6% |

UNITED STATES' TRIAL BRIEF
RE: DAMAGES
C15-1175 RSL - 20

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

The Court will hear testimony that as to the adult family home, Plaintiffs' life care planning expert did not provide the source of this estimated cost, which she believes would begin when SLP turns 18, even though SLP would have access to special education services from her school until she reaches the age of 22. Furthermore, it is unclear whether the recommendation of Dr. Glass concerning the type of adult family home that SLP should be placed in even exists in a form that can be calculated to a reasonable degree of certainty. Finally, other errors present in Plaintiffs' LCP concerning the calculation and cost of future care and recommendations that were not provided by any of Plaintiffs' experts call into question the reliability of this life care plan as a roadmap for SLP's reasonable and necessary future extraordinary medical care.

Defendant's life care plan, by contrast, anticipates that the cost of full-time adult care to be $60,000-$78,000 annually beginning when SLP turns 22. Defendant's life care plan also provides the cost of care should the Court conclude that SLP is able to live semi-independently. Defendant's life care expert, Rebecca Bellerive, will explain the cost basis for each proposed recommendation, all of which are supported by Defendant's experts. Accordingly, the Court should adopt Defendant's life care plan and the proposals contained therein as the reasonable and necessary care and costs for SLP's future extraordinary medical expenses.

### d.     Net Present Value of Life Care Plans

Finally, the Court will be presented with three options for calculating the net present value of SLP's life care plan.

Plaintiffs' expert, Mr. Brandt, has calculated the discount rate by utilizing the historical average yield on-year U.S. Treasury Securities. The Court should reject this method. Utilizing a one-year discount rate assumes all funds would be invested into highly liquid, short-term maturity assets. Under Mr. Brandt's calculation, Plaintiffs' life care plan has a degree of liquidity which

UNITED STATES' TRIAL BRIEF
RE: DAMAGES
C15-1175 RSL - 21

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   would otherwise not have been realized and unfairly shifts an extensive amount of economic

2   benefit to Plaintiffs at the expense of Defendant.

3       By contrast, Defendant's expert, Mr. Partin, will present to the Court two options, a mixed

4   portfolio discount rate and a tiered treasury discount rate, both of which are safe and diversified

5   investments providing SLP with the liquidity needed in her life plan while still protecting the

6   principal. Perhaps most importantly is that Mr. Brandt and Mr. Partin both agree that calculating

7   a discount rate that utilizes a tiered treasury discount rate – the average yield of tiered Treasury

8   securities with maturities ranging from one to thirty years – is a valid and commonly accepted

9   approach to calculating the discount rate. Mr. Partin has provided the Court with that calculation;

10  Mr. Brandt did not.

11      Based on this, the United States requests that the Court adopt its life care plan and award

12  special damages consistent with the net present values calculated by Defendant's expert economist.

13  ### C.    MEDICAL REVERSIONARY TRUST

14      Whatever special damages are awarded for SLP's future extraordinary medical care should

15  be placed in a medical reversionary trust to further the aims of Washington State's periodic

16  payment statute and the Federal Tort Claims Act, which requires the United States to be treated as

17  a private defendant under the applicable state law. *See Winters v. United States*, 655 F. App'x 547,

18  548-49 (9th Cir. 2016) (citing *United States v. Olson*, 546 U.S. 43, 45-46 (2005)).

19      Pursuant to Washington State's periodic payment statute, R.C.W. § 4.56.260, the United

20  States hereby requests that following trial the Court solicit proposals and enter a judgment which

21  provides for the periodic payment of SLP's future extraordinary economic damages. *See also*

22  *Dutra v. United States*, 478 F.3d 1090, 1091 (9th Cir. 2007) (holding that invocation of

23

UNITED STATES' TRIAL BRIEF
RE: DAMAGES
C15-1175 RSL - 22

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  Washington's periodic payment statute in the United States' trial brief was sufficient notice for the

2  Court and plaintiff).

3          Under the FTCA, the Court is permitted to "craft remedies that approximate the results

4  contemplated by state statutes[.]" *Id.* at 1092. Defendant is providing the Court with an initial

5  proposal for payment of SLP's future extraordinary medical care through the formation of a

6  medical reversionary trust based on the costs of the life care plan prepared by Defendant's expert,

7  Rebecca Bellerive. *See* Declaration of Annemarie McAnally.[7]

8          Here, a medical reversionary trust for SLP's future medical care is necessary and fair based

9  on the unique facts of this case. First, under a wrongful life claim, the Government is not

10 responsible for any and all future expenses that SLP may incur, including food, rent, etc. Rather,

11 the Government is only liable for extraordinary and necessary medical expenses arising directly

12 from her PMG. As discussed above, however, no expert can definitively predict today what the

13 extent and nature of SLP's needs will be in the future. Therefore, a medical reversionary trust

14 provides access to the funds for any medical care SLP may need, but allows any unused funds to

15 revert back to the United States if they go unused.

16         While the Court ultimately determined at the liability phase that birth defects are within

17 the general field of danger in a wrongful birth case, here, the Government's negligence did not

18 actually *cause* the PMG. Accordingly, a medical reversionary trust is an appropriate damages

19 remedy here and is fair to both parties.[8]  The unique contours of a claim for wrongful life, which

20 _____

21 [7] Defendant would request the opportunity to fully brief the periodic payment issue and the medical reversionary trust following the Court's decision on SLP's future extraordinary expenses and prior to the entry of judgment.

22 [8] Plaintiffs argue that a medical reversionary trust makes SLP ineligible for the Medicaid benefits she currently receives. However, SLP won't *need* Medicaid benefits anymore because all of her healthcare needs will be provided
23 in accordance with the life care plan awarded by the Court. In the unlikely case that the funds in the medical reversionary trust become exhausted, SLP will still become eligible Medicaid again the future.

UNITED STATES' TRIAL BRIEF
RE: DAMAGES
C15-1175 RSL - 23

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   compensates a child for any extraordinary future medical expenses and special training, is naturally

2   speculative to an extent.  The *Harbeson* court made a conscious decision to prohibit recovery of

3   general damages by a child alleging a claim of wrongful life.

4          A medical reversionary trust will alleviate concerns about speculative and unnecessary

5   future medical costs that may never come to pass by providing the United States with a

6   reversionary interest of any funds that are not used to pay for SLP's future extraordinary medical

7   expenses and special training. However, if those expenses are necessary, the medical reversionary

8   trust provides ample support to fund those recommendations. The trust's seed money, along the

9   purchased annuity, will allow this special damage award to grow in value over time until SLP

10  needs the care, which the parties all agree the bulk of which will not be necessary until she reaches

11  the age of majority.

12         Second, the history of domestic violence in this family, coupled with the current

13  immigration status of SLP's parents, necessitates additional protection over SLP's award. A

14  medical reversionary trust managed by a third party, rather than a special needs trust where the

15  trustee(s) are often family members, will avoid any uncertainty regarding access to and control

16  over the funds that are awarded solely for the benefit of SLP.

17         Furthermore, a medical reversionary trust is appropriate in this case, because unlike the

18  defendants in *Plowman*, *Harbeson* & *Wuth*, the United States did not know, or failed to discover

19  that SLP would be born with this genetic birth defect. There's no allegation that the United States

20  negligently failed to inform the Plaintiffs that SLP was carrying a genetic marker for PMG. The

21  negligence here was the United States' failure to administer a DepoProvera shot.

22         Finally, Plaintiffs have indicated that a medical reversionary trust is not in the best interest

23  of SLP, since she would not be able to use the funds in that trust for ordinary expenses of life. As

UNITED STATES' TRIAL BRIEF
RE: DAMAGES
C15-1175 RSL - 24

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   an initial matter, the periodic payment statute in Washington does not require or instruct the Court

2   to consider the best interests of a plaintiff, nor is the purpose behind the periodic payment statute

3   to protect a plaintiff's interests. *See Stokes v. United States*, 967 F.3d 1034, 1042 (10th Cir. 2020)

4   (rejecting plaintiff's argument that the district court erred by failing to consider the minor

5   plaintiff's best interests in ordering the creation of a reversionary trust following an FTCA verdict

6   because the Oklahoma periodic payment statute did not require consideration of a minor's "best

7   interests").

8        Similarly here, the purpose of the Washington periodic payment statute is to provide a

9   method for the Court to structure an award of future extraordinary medical care in a way that does

10   not result in a windfall to the plaintiff, but instead provides for all of the necessary extraordinary

11   future medical care that may be needed. The Washington legislature has provided a mechanism

12   for defendants to spread out payment of future medical expenses over time, and also allowed for

13   those payments to potentially cease upon the death of the injured plaintiff and revert to the

14   defendant. *See* R.C.W. § 4.56.260(5) ("Upon the death of the judgment creditor, the court which

15   rendered the original judgment may, upon petition of any party in interest, modify the judgment to

16   award and apportion the unpaid future damages. Money damages awarded for loss of future

17   earnings shall not be reduced or payments terminated by reason of the death of the judgment

18   creditor.").

19        Accordingly, prior to the entry of a judgment related to special damages related to SLP's

20   future extraordinary medical care and special training, the Court should solicit proposals on how

21   to address the requirements of Washington's periodic payment statute.

22

23

UNITED STATES' TRIAL BRIEF
RE: DAMAGES
C15-1175 RSL - 25

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1

### IV.    CONCLUSION

2        For the reasons discussed herein, the government respectfully requests that the Court adopt

3    the approach set forth by the United States at trial on damages.

4        DATED this 9th day of September, 2020.

5                                Respectfully submitted,

6                                BRIAN T. MORAN
                                 United States Attorney
7
                                  /s/ Matt Waldrop
8                                MATT WALDROP, GA # 349571
                                 KRISTEN R. VOGEL, NY BAR #5195664
9                                Assistant United States Attorneys
                                 United States Attorney's Office
10                               700 Stewart Street, Suite 5220
                                 Seattle, Washington 98101-1271
11                               Phone: 206-553-7970
                                 Fax: 206-553-4067
12                               Email: james.waldrop@usdoj.gov
                                 Email: kristen.vogel@usdoj.gov
13

14

15

16

17

18

19

20

21

22

23

UNITED STATES' TRIAL BRIEF
RE: DAMAGES
C15-1175 RSL - 26

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970